UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

UNIFIED PATENTS, LLC

Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC

Patent Owner

_____

***Inter Partes* Review No. IPR2021-00917**

**Patent No. 7,933,431**

**PATENT OWNER'S NOTICE OF APPEAL**

Filed on behalf of Patent Owner by:

Todd E. Landis (Reg. No. 44,200)
2633 McKinney Ave., Suite 130
Dallas, TX 75204

John Wittenzellner (Reg. No. 61,662)
1735 Market Street, Suite A #453
Philadelphia, PA 19103

Adam B. Livingston (Reg. No. 79,173)
601 Congress Avenue, Suite 600
Austin, TX 78701

**WILLIAMS SIMONS & LANDIS PLLC**

Notice is hereby given, pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. § 90.2(a), that Patent Owner Gesture Technology Partners, LLC ("GTP") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision ("FWD") entered on November 21, 2022 (Paper 31), and from all underlying orders, decisions, rulings and opinions that are adverse to GTP, including, without limitation, those within the Decision Granting Institution of *Inter Partes* Review, entered on November 22, 2021 (Paper 11).  In accordance with 37 C.F.R. § 90.2(a)(3)(ii), the issues on appeal include, but are not limited to the Patent Trial and Appeals Board's ("Board") determinations that claims 7 – 9 and 12 of U.S. Patent No. 7,933,431 are unpatentable; the Board's consideration and analysis of the expert testimony, prior art, and other evidence in the record; the Board's decision to institute *inter partes* review; and the Board's factual findings, conclusions of law, or other determinations supporting or relating to the above issues.

Pursuant to 37 C.F.R. § 90.2(a)(1) and (a)(2), and as reflected in the attached Certificate of Service, this Notice of Appeal is being electronically filed with the Patent Trial and Appeal Board through the Patent Trial and Appeal Case Tracking System (P-TACTS) and the United States Court of Appeals for the Federal Circuit through the CM/ECF System along with the requisite filing fee.  A copy is also being mailed to the Office of General Counsel at the U.S. Patent and Trademark Office.

DATED:  January 20, 2023                    Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of this Notice of Appeal

was filed electronically with the Director of the United States Patent and Trademark

Office, as well as sent via Priority Mail Express from the U.S. Postal Service to the

following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of this Notice of Appeal

was filed electronically with the Clerk's Office of the United States Court of Appeals

for the Federal Circuit, as well as sent via FedEx Priority Overnight to the following

address:

United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W., Suite 401
Washington, DC 20005

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. § 42.6, the undersigned certifies that on January 20,

2023, the foregoing document was served on counsel of record for Petitioner by

filing this document through the End-to-End System, as well as via electronic mail

to counsel of record for Petitioner at the following address:

Raghav Bajaj (raghav.bajaj.ipr@haynesboone.com)

Ashraf Fawzy (afawzy@unifiedpatents.com)

Alyssa Holtslander (alyssa@unifiedpatents.com)

David L. McCombs (david.mccombs.ipr@haynesboone.com)

Angela Oliver (angela.oliver.ipr@hynesboone.com)

Respectfully submitted,

By: /Todd E. Landis/
Todd E. Landis
Registration No. 44,200
Counsel for Patent Owner

Trials@uspto.gov
571-272-7822

Paper 31
Entered: November 21, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

UNIFIED PATENTS, LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

_____

IPR2021-00917
Patent 7,933,431 B2

_____

Before KEVIN F. TURNER, BRENT M. DOUGAL, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Denying Petitioner's Motion to Strike
*35 U.S.C. § 318(a)*

IPR2021-00917
Patent 7,933,431 B2

## I.    INTRODUCTION

### A.    Background

Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review challenging the patentability of claims 7–13 (the "challenged claims") of U.S. Patent No. 7,933,431 B2 (Ex. 1001, "the '431 patent"). Paper 11 ("Dec."). Petitioner, Unified Patents, LLC, filed the request for an *inter partes* review (Paper 1, "Petition" or "Pet."), which Patent Owner, Gesture Technology Partners, LLC, opposed (Papers 6, 8).[1]

After institution, Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 17, "Reply"), and Patent Owner filed a Sur-reply (Paper 18, "Sur-reply"). Petitioner also filed a Motion to Strike (Paper 19) and Patent Owner filed an Opposition to the Motion to Strike (Paper 23). An oral hearing was held on August 30, 2022, and a copy of the transcript was entered into the record. Paper 30 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Having reviewed the arguments of the parties and the supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence, that claims 7–9, and 12 are unpatentable. We also determine that Petitioner has *not* shown that claims 10, 11, and 13 are unpatentable.

### B.    Related Matters

The parties identify the following as related matters involving the '431 patent:  *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v.*

---

[1] Petitioner also filed a Preliminary Reply. Paper 7.

2

IPR2021-00917
Patent 7,933,431 B2

*Samsung Electronics Co.*, No. 2:21-cv-00041 (E.D. Tex.); *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex.); *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, No. 1:22-cv03535 (ND Ill.); and *Gesture Technology Partners, LLC v. Katherine K. Vidal*, No. 1:22-cv-622 (E.D. VA). Pet. 1; Paper 24, 1–3. Patent Owner identifies the following Board proceedings as related matters: IPR2021-00920; IPR2021-00922; and IPR2021-00923. Paper 24, 2–3. Patent Owner also identifies the following related *Ex Parte* Reexaminations: No. 90/014,900; No. 90/014,901; No. 90/014,902; and No. 90/014,903. *Id.* at 3–4.

    C.    *The '431 Patent*

    The '431 patent "relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." Ex. 1001, 2:7–11. The '431 patent further states that it relates to "applications in a variety of fields such as computing, gaming, medicine, and education." *Id.* at 2:15–17. For instance, the '431 patent describes "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 11:54–58.

    Figure 8A, reproduced below, illustrates the control of functions via a handheld device.

IPR2021-00917
Patent 7,933,431 B2



*FIG. 8A*

Figure 8A shows a perspective view of a cellular phone (800) using a laser spot projector (801) to project a laser spot on a detector (802) in a dashboard (803). *Id.* at 12:17–20. The '431 patent discloses that, alternatively or in conjunction, round dot targets (805, 806, 807) can be sensed on the cellular phone (800), such as by a TV camera (815). *Id.* at 12:20–25.

In another example, the cellular phone (800) can be used to signal a fax unit (824) to print data from the phone by pointing the cellular phone toward the fax unit. *Id.* at 12:42–45. TV camera (815) scans images of the dot targets (805, 806, 807) and a computer (830) analyzes the target images to determine the position and/or orientation or motion of the cellular phone to thereby determine if a command is being issued with movement of the cellular phone. *Id.* at 12:45–51. The computer then commands the fax unit to print if this action is signaled by the position, orientation, or motion of the cellular phone. *Id.* at 12:51–52.

D.    *Illustrative Claim*

Petitioner challenges claims 7–13 of the '413 patent. Claim 7 is the sole independent claim and is illustrative:

IPR2021-00917
Patent 7,933,431 B2

> 7. Handheld computer apparatus comprising:
>> a housing;
>> a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;
>> computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and
>> means for controlling a function of said apparatus using said information.

Ex. 1001, 25:61–26:5.

## II.    ANALYSIS

### A.    *Summary of Issues*

In the below analysis, we first address the grounds of unpatentability. We then address jurisdiction over expired patents and end with the Motion to Strike.

### B.    *Instituted Grounds*

Petitioner asserts the following grounds of unpatentability (Pet. 5), supported by the declaration of Christopher M. Schmandt (Ex. 1003):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 7–9, 11, 12 | 102(e)[2] | Numazaki[3] |
| 7, 9, 11 | 103(a) | Rhoads[4] |
| 7–12 | 103(a) | Doi,[5] Cousins[6] |
| 13 | 103(a) | Doi, Cousins, Parulski[7] |

---

[2]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103, 112 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA versions.

[3]  U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1007).

[4]  U.S. Patent Application Publication 2005/0013462 A1, published Jan. 20, 2005 ("Rhoads") (Ex. 1004).

[5]  U.S. Patent 6,266,061 B1, issued July 24, 2001 ("Doi") (Ex. 1005).

[6]  U.S. Patent 6,417,797 B1, issued July 9, 2002 ("Cousins") (Ex. 1006).

[7]  U.S. Patent 5,666,159, issued Sept. 9, 1997 ("Parulski") (Ex. 1008).

IPR2021-00917
Patent 7,933,431 B2

C.    *Legal Standards*

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

"A claim is anticipated [under 35 U.S.C. § 102] only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Moreover, "[b]ecause the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). Whether a reference anticipates is assessed from the perspective of an ordinarily skilled artisan. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003) ("'[T]he dispositive question regarding anticipation [i]s whether one skilled in the art would reasonably understand or infer from the [prior art reference's] teaching' that every claim element was disclosed in that single reference.").

A claim is unpatentable as obvious under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including (1) the

IPR2021-00917
Patent 7,933,431 B2

scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

D.    *Level of Ordinary Skill*

Petitioner asserts that "[a] person of ordinary skill in the art at and before the priority date for the '431 Patent ('POSITA') would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or a related subject, and one to two years of work experience with human-computer interaction" and that less experience may be necessary with additional education and vice versa. Pet. 9 (citing Ex. 1003 ¶¶ 36–40). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. PO Resp. 6.

We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '431 patent and prior art of record. We adopt this definition for the purposes of this Decision.

E.    *Claim Construction*

In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2021).

IPR2021-00917
Patent 7,933,431 B2

Petitioner provides a number of claim constructions. Pet. 13–17. Patent Owner addresses some of Petitioner's claim constructions, and further argues that the preamble of claim 7 should be limiting. PO Resp. 6–11.

We only address some of the constructions relevant to the current controversy. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### 1.    *Claim 7's Preamble*

The preamble of claim 7 states: "Handheld computer apparatus comprising . . . ." Ex. 1001, 25:61. The Petition does not address whether the preamble of claim 7 is limiting, but rather attempts to show that, independent of whether it is limiting, the preamble is taught by the prior art. *See, e.g.,* Pet. 21 ("To the extent the preamble is limiting, the combined teachings of Doi and Cousins render it obvious").

Patent Owner argues that the preamble should be limiting because it recites essential structure or steps and is "necessary to give life, meaning, and vitality" to claim 7. PO Resp. 6 (quoting *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018)). Specifically, Patent Owner asserts that claim 7's final limitation refers back to the preamble's "handheld computer apparatus" for antecedent basis. *Id.* at 7. Patent Owner further argues that the '413 patent discloses different embodiments, with some embodiments being in the form of a computer and some embodiments being in the form of a handheld device. *Id.* at 7 (citing Ex. 1001, 12:59–13:7, Fig. 1A). Patent Owner contends that claim 7 claims the latter embodiments because claim 7 recites a handheld device and,

IPR2021-00917
Patent 7,933,431 B2

therefore, "the preamble is necessary to give life, meaning, and vitality to claim 7, consistent with the embodiments that the inventor chose to claim." *Id.* at 7–8.

Petitioner implicitly agrees that the preamble is limiting, but argues that "The Entirety of the Preamble is Not Necessarily a Limitation." Reply 1 (emphasis omitted). Petitioner would have us dissect the single limitation "handheld computer apparatus" and have us only impart weight to the word "apparatus." *Id.* Petitioner provides no support for the idea that a term can be dissected, but rather points to case law where only certain limitations of multiple separate limitations in a preamble were given weight. *Id.* (citing *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323–24 (Fed. Cir. 2015).

We agree that the preamble of claim 7 is limiting. The last clause of claim 7 refers back to the preamble and is understood with reference thereto. The last clause states: "means for controlling a function of *said apparatus* using said information." Ex. 1001, 26:4–5 (emphasis added). "Said apparatus" derives antecedent basis from the "[h]andheld computer apparatus" recited in the preamble. "Said apparatus" does not refer to "apparatus" in the abstract, dissected from the rest of the term. Moreover, the "means for controlling a function of said apparatus" can be understood because of this reference to the handheld computer apparatus.

We disagree with Petitioner that the "handheld computer" portion of the term "[h]andheld computer apparatus" can be ignored. The claim defines the "apparatus" as a "[h]andheld computer apparatus," and we determine that there is no legal basis for us to dissect this phrase. Petitioner argues that the body of claim 7 only refers to the "apparatus" and not to "handheld computer," thus "handheld computer" is not essential. But the term is "[h]andheld computer apparatus" not merely "apparatus," and the body of

IPR2021-00917
Patent 7,933,431 B2

the claim refers back to "*said* apparatus" which is the "[h]andheld computer apparatus."

Thus, we determine that the single term in the preamble, "[h]andheld computer apparatus," is limiting because it recites essential structure and is "necessary to give life, meaning, and vitality" to claim 7.

> 2.    *Camera Means*

Petitioner asserts that claim 7's limitation of "camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 14. Petitioner argues that the limitation's function "is obtaining an image using reflected light of at least one object positioned by a user operating said object" and the corresponding structure "is one or more TV cameras (e.g., TV camera 815) or other suitable electro-optical sensors, and equivalents thereof." *Id.* (citing Ex. 1001, 3:15–29; Ex. 1003 ¶¶ 50–51).

Patent Owner disagrees and argues that:

> This term does not require construction under 35 U.S.C. §112, ¶ 6 because "camera" is a well-known term that connotes specific structure to a POSITA. *See* Ex. 2007, ¶¶ 46-47. The claimed function is "obtaining an image . . . of at least one object." This is what cameras do. *See id.* They obtain images of objects. *See id.*

PO Resp. 8.

Though the parties disagree as to whether the term should be construed as a means-plus-function limitation under §112 ¶ 6, both constructions essentially encompass cameras, and therefore it is unnecessary for us to construe as resolution of the dispute does not turn on whichever construction we pick.

IPR2021-00917
Patent 7,933,431 B2

### 3.    Computer Means

Petitioner contends that claim 7's limitation of "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 15. Petitioner argues that the limitation's function "is analyzing an image to determine information concerning a position or movement of an object" and the corresponding structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object." *Id.* (citing Ex. 1001, 6:9–18, 7:22–29, 12:1–9, 12:46–52, 17:34–50; Ex. 1003 ¶¶ 53–56).

Patent Owner does not address this term in its claim construction section (PO Resp. 6–11), but later argues that a "more accurate function is 'analyzing the image obtained by the camera means to determine information concerning a position or movement of an object'" (*id.* at 33). Thus, Patent Owner implicitly agrees that this term is subject to §112 ¶ 6. Patent Owner does not further explain its position; however, this slight change in function from Petitioner's position seems to merely reflect the fact that "said image" is referring to "obtaining an image" in the prior camera means limitation.

Neither party argues that either description of the function would be dispositive to any issue herein. For example, Petitioner does not address or contest Patent Owner's supplement to the construction. Reply 1–8, 20–22.

We accept and apply Petitioner's construction with Patent Owner's slight modification because it more accurately states the claimed function.

IPR2021-00917
Patent 7,933,431 B2

We further note that the corresponding structure identified by Petitioner further encompasses equivalents thereof. *See* 35 U.S.C. § 112 ¶ 6.

### 4. *Means for Controlling a Function*

Petitioner argues that claim 7's limitation of "means for controlling a function of said apparatus using said information" is a means-plus-function limitation under §112 ¶ 6. Pet. 15. According to Petitioner, the limitation's function "is controlling a function of said apparatus using said information" and the corresponding structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to" (1) receive position information, (2) correlate the position information with a function of the apparatus, and (3) cause the apparatus to perform the function, wherein the function includes one or more of: (a) a display function, (b) a command to print, (c) an image transmission function, or (d) an e-mail transmission function. *Id.* at 15–16 (citing Ex. 1001, 12:46–52, 12:65–66, 13:36–40, 13:63–67, 26:8–9; Ex. 1003 ¶¶ 58–59).

Patent Owner does not address Petitioner's construction. PO Resp. 6–11. However, as discussed above, we determine that "said apparatus" refers to the handheld computer apparatus in the preamble. Thus, we accept Petitioner's construction with the added requirement that the general purpose computer be a handheld computer apparatus and that the corresponding structure further encompasses equivalents thereof.

### 5. *Means for Transmitting Information*

Petitioner asserts that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6. Pet. 17. Petitioner argues that the limitation's function "is transmitting information" and the corresponding structure "is a mobile phone link and equivalents thereof." *Id.* (citing Ex. 1001, 12:65–13:3; Ex. 1003 ¶¶ 61–62).

IPR2021-00917
Patent 7,933,431 B2

Patent Owner disagrees only with the identified structure, which it argues should be "a cell phone, and equivalents thereof." PO Resp. 9 (citing Ex. 2007 ¶¶ 49–50).

The District Court for the Eastern District of Texas also addressed this issue. Ex. 2004, 29–32. There the parties argued that the structure should be either "a transmitter" or a "cellular transceiver." *Id.* at 29. However, the District Court found that the only structure identified in the '431 patent for performing the function of "transmitting information" is a cell phone. *Id.* at 30–31. It pointed to the discussion around Figure 8A that states that the handheld device can be a cell phone, and then the discussion around Figure 8B, which we address below. *Id.* Important to the District Court's analysis (*see id.* at 31), the Specification discloses:

> One function is just to acquire an image for transmission via for example the cell phone[']s own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852 is transmitted over mobile phone link 853 to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

Ex. 1001, 12:65–13:7. Figure 8B is reproduced below.



**FIG. 8B**

IPR2021-00917
Patent 7,933,431 B2

As discussed above, Figure 8B shows cell phone 851 that acquires an image and transmits the image over mobile phone link 853. *Id.* Patent Owner argues, consistent with the finding of the District Court that the cell phone is the disclosed structure that transmits information. PO Resp. 9–11.

Petitioner argues that the "cell phones own connection" and "mobile phone link 853" are the relevant disclosed structure, which Petitioner further defines as "e.g., transmitter hardware–not a complete cellular phone." Reply 6. Petitioner further argues that a transmitter is all that is required to perform the defined function. *Id.* at 6–7.

In Figure 8B, mobile phone link 853 is identified by an arrow as opposed to any internal structure within a cell phone. This is consistent with the context of a "link" or "connection" between the cell phone and some other device. Thus, we determine that neither the "cell phones own connection" nor the "mobile phone link 853" refers to a structure internal to the cell phone. Thus, the only disclosed structure in the '431 patent for performing the function of "transmitting information" is a cell phone.

We decline Petitioner's invitation to define the structure as merely a transmitter. Pet. 17; Reply 6–8. Petitioner does not identify structure in the '431 patent that would support such a finding. Further, Petitioner's position includes transmitters alone and is not limited to transmitters in cell phones even though Petitioner admits that the base disclosure identified in the '431 patent is a cell phone.

Thus, we determine that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6; that the limitation's function "is transmitting information;" and that the corresponding structure is "a cell phone and equivalents thereof."

IPR2021-00917
Patent 7,933,431 B2

> F.    *35 U.S.C. § 102 – Numazaki*

Petitioner argues that Numazaki anticipates claims 7–9, 11, and 12. Pet. 35–42. Patent Owner contends that Numazaki does not disclose all the limitations of independent claim 7, or dependent claim 11. PO Resp. 28–38.

We first give a short overview of the asserted prior art, Numazaki. This is followed by a discussion of Petitioner's position and Patent Owner's arguments in response where we conclude that Petitioner has shown by a preponderance of the evidence that claims 7–9 and 12 are unpatentable, but has not shown that claim 11 is unpatentable.

> *1.    Numazaki*

Numazaki "relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object." Ex. 1007, 1:8–11. Figure 1, reproduced below, depicts a block diagram for an information input generation apparatus.



FIG.1

Figure 1 shows an information input generation apparatus including a lighting unit (101), a reflected light extraction unit (102), a feature data generation unit (103), and a timing signal generation unit (104). *Id.* at 10:23–28. Numazaki describes emitting light from the light emitting unit (101) and

IPR2021-00917
Patent 7,933,431 B2

that the intensity of the light varies in time according to a timing signal from the timing signal generation unit (104). *Id.* at 10:29–31. The light is directed onto a target object and light reflected from the target object is extracted by the reflected light extraction unit (102). *Id.* at 10:31–35. Numazaki teaches that the feature data generation unit (103) extracts feature data from the reflected light image. *Id.* at 10:57–61. Numazaki further teaches operating a computer based on information obtained from the feature data. *Id.* at 10:61–66.

Figure 78, reproduced below, illustrates an information input generation apparatus.

**FIG.78**



Figure 78 shows "a compact portable information device" having "a size that can be held by one hand." *Id.* at 52:5–8. The device includes a window (712) for a lighting unit and a photo-detection sensor unit. *Id.* at 52:12–14. Numazaki describes controlling the position of a cursor (714) on a screen by moving a finger (713) in front of the window (712). *Id.* at 52:14–16.

IPR2021-00917
Patent 7,933,431 B2

### 2. Independent Claim 7

Petitioner relies on Numazaki for teaching all of the elements of claim 7. Pet. 36–41. For example, Petitioner relies on Numazaki's compact portable information device in Figure 78 for teaching the handheld computer apparatus of claim 7. *Id.* at 36 (citing Ex. 1007, 52:5–8; Ex. 1003 ¶¶ 139–141); *see also* Ex. 1007, Fig. 78. Petitioner argues that Numazaki teaches a photo-detection sensor unit inside the housing of the compact portable information device which reads on the camera means associated with a housing of the claim. Pet. 36–38 (citing Ex. 1007, 52:8–14, Fig. 78; Ex. 1003 ¶¶ 142–143, 151). Petitioner argues that the feature data generation unit 103 in Numazaki would be understood to be the claimed computer means. *Id.* at 38–39 (citing Ex. 1007, 10:57–61, 16:27–28, 17:19–23, 17:51–56; Ex. 1003 ¶¶ 156–160). Petitioner also argues that Numazaki's teaching of a computer process to use a fingertip to control a cursor reads on the claimed "means for controlling a function of said apparatus using said information." *Id.* at 39–41 (citing Ex. 1007, 26:8–18, 26:23–25, 52:14–16; Ex. 1003 ¶¶ 161–165).

Patent Owner argues that Numazaki does not teach aspects of the camera means and computer means claim elements. PO Resp. 28–36. We address each argument in turn below and then address the claim as a whole.

### a) Camera Means

Claim 7 requires "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object." Ex. 1001, 25:63–65. Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant structure "is one or more TV cameras (e.g., TV camera 815) or other suitable electro-optical sensors, and equivalents thereof." Pet. 14 (citing Ex. 1001, 3:15–19).

IPR2021-00917
Patent 7,933,431 B2

As noted above, Patent Owner disagrees that 35 U.S.C. § 112 ¶ 6 is implicated, and argues that the camera means merely requires a camera. PO Resp. 8–9. Thus, both parties agree that "camera means" can be satisfied if the prior art teaches a camera (subject to the other limitations of the claim, "associated with said housing," etc.).

Petitioner argues that Numazaki teaches a photo-detection sensor unit inside the housing of the compact portable information device, which reads on the camera means associated with a housing as claimed. Pet. 36–38 (citing Ex. 1007, 52:8–14, Fig. 78; Ex. 1003 ¶¶ 142–143, 151).

Numazaki only provides some details about the photo-detection sensor unit. *See generally* Ex. 1007, 50:25–54:6. However, Petitioner relies on Numazaki's statement that "the disclosure of the first through seventh embodiments applies to the eighth embodiment" for more details about the photo-detection sensor unit. Pet. 37 (quoting Ex. 1007, 50:21–24); *see also* Ex. 1007, 53:22–36 (discussing "the photo-detection section" and then pointing to the prior discussion "as already described in detail above"). In particular, Petitioner equates the photo-detection sensor unit with the reflected light extraction unit (102) and photo-detection optics (107) of the first embodiment. Pet. 37. Petitioner argues that the "'reflected light extraction unit 102' . . . 'extracts the reflected light from the target object.'" *Id.* (quoting Ex. 1007, 10:33–35). And that this extraction is done using photo-detection optics (107). *Id.* (citing Ex. 1007, 11:11–15). Petitioner's declarant testifies that "[a] POSITA would have understood this term [("photo-detection optics")] to be applicable to a visible (or infrared) light camera." Ex. 1003 ¶ 149.

Petitioner concludes that "*Numazaki* discloses the function and corresponding structure of the recited *camera means . . . for obtaining an*

IPR2021-00917
Patent 7,933,431 B2

*image using reflected light of at least one object*, as the structure corresponding to the *camera means* limitation includes at least electro-optical sensors, such as those disclosed in *Numazaki*." Pet. 37 (citing Ex. 1003 ¶¶ 148–150).

Patent Owner first argues that "Numazaki is silent regarding the 'photo-detection sensor unit' being or including a camera" and that Numazaki fails to provide any details regarding the function of the photo-detection sensor unit and thus fails to disclose the photo-detection sensor unit obtains an image, as required by this claim element. PO Resp. 29 (citing Ex. 2007 ¶ 86). We disagree.

In support, Patent Owner relies on its declarant, who testifies:

I reviewed Numazaki in its entirety and it contains no disclosure stating that the "photo-detection sensor unit" is a camera. A POSITA would understand that Numazaki's disclosure that "photo-detection sensor unit" is capable of "photodetecting on an external body" (Ex. 1007, 52:9-14), does not necessarily mean that the "photo-detection sensor unit" is or includes a camera. Photo-detecting an external body does not mean that the "photo-detection sensor unit" captures an image, like a camera.

Ex. 2007 ¶ 86.

Patent Owner's declarant does not further explain his reasoning. For example, the declarant does not discuss why the discussion of photo-detecting "does not necessarily mean that the 'photo-detection sensor unit' is or includes a camera." The disclosure of Numazaki when discussing photo-detecting is directed to taking images; and according to both Patent Owner and their declarant obtaining images "is what cameras do." PO Resp. 8; Ex. 2007 ¶ 47 ("a POSITA would understand that cameras obtain images of objects").

IPR2021-00917
Patent 7,933,431 B2

For example, Numazaki describes a "photo-detecting state" in reference to when a photo-detection unit "detects the optical image." Ex. 1007, 11:20–31; *see also id.* at 11:38–52. Numazaki's eighth embodiment itself states that "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36;[8] *see also e.g., id.* at 10:33–56 (discussing a "photo-detection section" to capture reflected light as an image), 11:9–52, 12:56–65, 15:23–51.

Thus, the testimony of Patent Owner's declarant, which is stated as being based on "Numazaki in its entirety," does not appear to be consistent with how the term "photo-detecting" is used in Numazaki. Read in context, photo-detecting an external body *does* mean that the "photo-detection sensor unit" captures an image, like a camera, because that is how Numazaki uses the term. Thus, though Patent Owner is correct that Numazaki does not explicitly say that the "photo-detection sensor unit" is a camera, it is clear from the disclosure of Numazaki that "photo-detecting" refers to obtaining an image, which is what Patent Owner asserts is the function of a camera.

The function of the photo-detection sensor unit is further taught in a number of locations in Numazaki. For example, Numazaki at 52:8–14 (cited at Pet. 37) teaches that "a window 712 is provided for the lighting unit and the photo-detection sensor unit" to enable the function of "lighting and

---

[8] Numazaki also teaches that "CMOS sensors are used as the photo-detection means" in the eighth embodiment. Ex. 1007, 53:7–18. The '431 patent similarly teaches that "CMOS cameras" can be used to obtain images. Ex. 1001, 5:50–57.

IPR2021-00917
Patent 7,933,431 B2

photo-detecting on an external body." The paragraph continues to teach that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." Ex. 1007, 52:14–16. As discussed above, Numazaki teaches that in the eighth embodiment "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36.

As will be understood from reviewing Numazaki, Numazaki discloses an eighth embodiment having a number of different portable form factors shown in Figures 74–79, but sharing "a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments." *Id.* at 50:19–20. In addition to referring back to prior disclosure, additional details of the information input generation apparatus including the photo-detection section are provided at 52:33–54:6, which also refers back to the "the photo-detection section . . . , as already described in detail above." *Id.* at 53:22–36; *see also* Dec. 15 (explaining that "details about the photo-detection sensor unit" could be found at Ex. 1007, 50:25–54:6).

Thus, the function of the photo-detection sensor unit is taught by Numazaki. Further, this description of the function of the photo-detection sensor unit is consistent with, and points to, Numazaki's more detailed earlier discussion of the reflected light extraction unit and photo-detection optics, which teaches obtaining an image. *See* Ex. 1007, 10:33–35, 11:11–15 ("an image is formed on a photo-detection plane of the reflected light

IPR2021-00917
Patent 7,933,431 B2

extraction unit 102 by a photo-detection optics 107."), 50:21–42, 53:22–36;
Pet. 37.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches all the aspects of the camera means claim element including a camera.

> b)    *Computer Means*

Claim 7 requires "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Ex. 1001, 26:1–3. Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object." Pet. 15 (citing, *e.g.*, Ex. 1001, 12:46–52).

Petitioner argues that Numazaki's feature data generation unit 103 "which 'extracts [] information . . . from the reflected light image'" would be understood to be the claimed computer means. *Id.* at 38–39 (quoting Ex. 1007, 10:57–61). Petitioner argues that the feature data generation unit is "coupled to a digital memory, timing control, and other control components, and is depicted within a computing device; thus, it would be recognized as corresponding to part of a general purpose computing device, consistent with the structure of the recited computer means." *Id.* (citing Ex. 1003 ¶¶ 156–157) (emphasis omitted).

Petitioner further argues, among other things, that consistent with the above computer program, Numazaki teaches "that '[w]hen the hand is used as the target object, it is possible to capture the **information on a position** and a shape of the hand without a contact, so that it is possible to utilize the

present invention as a means for inputting information.'" *Id.* at 39 (quoting Ex. 1007, 17:19–23).

Patent Owner makes two arguments, that the Petition fails to disclose a general purpose computer, and that the structure of Numazaki is different from that of claim 7. We address each in turn.

*(1)    General Purpose Computer*

Patent Owner argues that the Petition fails to disclose a general purpose computer under Petitioner's claim construction. PO Resp. 33. Patent Owner argues that this is because the relied-upon "feature data generation unit" in Numazaki includes "numerous specialized units" and "Petitioner has not provided any explanation as to how these specialized units correspond to a 'general purpose computer.'" *Id.* at 33–34 (citing Pet. 38; Ex. 2007 ¶ 94). Patent Owner further argues that "[j]ust because a component is 'coupled to a digital memory, timing control, etc.'" or "'correspond[s] to part of a general purpose computing device' does not mean the component itself is necessarily a general purpose computer." *Id.* at 34.

Petitioner responds that the Petition relies on the eighth embodiment of Numazaki (Reply 21 (citing Pet. 37), which when discussing Figure 74 of the eighth embodiment describes a computer and "**a portable computer** generally called **note PC**" (*id.* (quoting Ex. 1007, 50:25–29)). Petitioner argues that "Numazaki's eighth embodiment, which Petitioner relied upon for claim 7's anticipation, expressly implements the 'feature data generation unit' in a generic 'computer' contrary to [Patent Owner's] arguments." *Id.* (citing Pet. 38–39; Ex. 1034 ¶¶ 76–81).

Patent Owner responds that "*Numazaki* does not disclose that the 'compact portable information device' is a 'generic computer.'" Sur-reply 15 (citing Ex. 1007, 52:5–19). Patent Owner does not contest that Numazaki

teaches that the eighth embodiment can be implemented in a generic computer, or that the Petition relies on the eighth embodiment. Patent Owner merely contests that the "compact portable information device" or the device shown in Figure 78 is not expressly taught as a generic computer.

As discussed above, Numazaki uses Figures 74–79 to show different form factors of the eighth embodiment. *See* Ex. 1007, 50:19–20. As demonstrated by Petitioner, Numazaki teaches that the eighth embodiment can be implemented in a general purpose computer. This is in direct contrast to Patent Owner's argument that the feature data generation unit is not "necessarily" implemented in a general purpose computer. PO Resp. 34. We further determine that Petitioner's argument and evidence shows what one of skill would understand that Numazaki teaches that the feature data generation unit is implemented in a general purpose computer.

*(2)    Structure of Numazaki*

Patent Owner argues that:

> Numazaki requires: (1) two, not one, photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. Simply put, this is fundamentally different than the apparatus recited in claim 7.

PO Resp. 35; *see id.* at 34–35 (describing Numazaki in more detail) (citing Ex. 1007, 10:57–66, 11:20–56, Fig. 2).

Patent Owner further argues that:

> The alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images of an object from one TV camera. The alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images without a lighting unit to illuminate the object. And the alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images of an object without

circuitry for subtracting one image from another. Accordingly, Numazaki does not disclose corresponding structure for performing the recited function of [the] claim element.

*Id.* at 35–36 (internal citations omitted).

We are persuaded, however, that Petitioner has adequately shown that Numazaki teaches the claimed computer means.

Patent Owner appears to argue that the camera means requires one camera and that the computer means analyzes images from only that one camera. *Id.* Patent Owner does not identify why the claim should be *limited* to one camera or one image.

Petitioner argued in its claim construction that the structure in the '431 patent for the camera means is "one or more TV cameras (or other suitable electro-optical sensors)." Ex. 1001, 3:17–18; Pet. 14. Patent Owner argued that "'[a] camera means' is properly construed as 'a camera.'" PO Resp. 9. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).

Moreover, we find that the '431 patent appears to expressly contemplate one or more TV cameras. *See* Ex. 1001, 3:25 ("A stereo pair of cameras 100 and 101"), 3:44 ("a three camera arrangement can be used"). Patent Owner does not identify, and we were not able to find, any disclosure in the '431 patent that these multiple cameras are used to obtain only a single image to support Patent Owner's argument that the claim should be limited to either a single camera or a single image.

IPR2021-00917
Patent 7,933,431 B2

Thus, based on the record, the claim encompasses one or more cameras for obtaining one or more images, and analyzing those one or more images.

Second, as to Patent Owner's argument that Numazaki requires a lighting unit for illumination, claim 7 uses the term "comprising" to create an "open ended" claim. "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Thus, the presence of a lighting unit is not excluded from the claim. Rather, the '431 patent teaches the use of LEDs "to illuminate [associated] targets" and claim 12, which depends from claim 7, expressly requires "a light source for illuminating said object." Ex. 1001, 3:34–35, 26:14–15.

Third, it is not clear what relevance Patent Owner's following statement has to the claim: "Numazaki cannot analyze target images of an object without circuitry for subtracting one image from another." This level of detail on how the target images are analyzed by the computer does not appear to be implicated by the current claim construction. Thus, even if true, the statement does not identify errors in the Petition.

> c)    *Conclusion as to Claim 7*

After review of the arguments and evidence, and further in view of the above discussion, we determine that the Petition has shown, by a preponderance of the evidence, that claim 7 is unpatentable as anticipated by Numazaki.

> 3.    *Dependent Claims 8, 9, 12*

Petitioner argues that Numazaki anticipates dependent claims 8, 9, and 12. Pet. 41–42 (citing Ex. 1007, 10:29–31, Fig. 78; Ex. 1003 ¶¶ 166–

IPR2021-00917
Patent 7,933,431 B2

170, 175–177). Patent Owner relies on its arguments over claim 7 for the patentability of these claims. PO Resp. 36. We have reviewed Petitioner's assertions and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 8, 9, and 12 are unpatentable.

### 4.    Dependent Claim 11

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information." Ex. 1001, 26:12–13. As noted previously, Petitioner argues that the "means for transmitting information" is subject to 35 U.S.C. § 112 ¶ 6, and that "[t]he structure corresponding to this function is a mobile phone link and equivalents thereof." Pet. 17 (citing Ex. 1001, 12:65–13:3).

We determine above that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under 35 U.S.C. §112 ¶ 6; that the limitation's function "is transmitting information;" and that the corresponding structure is "a cell phone and equivalents thereof."

Petitioner argues that "*Numazaki* discloses this limitation." *Id.* at 42. This is because "*Numazaki* describes a 'transmission unit 356' which 'transmits the extracted image.'" *Id.* (quoting Ex. 1007, 40:45–49); *see also* Ex. 1003 ¶ 172 (Petitioner's Declarant making an identical statement).

As the Petition does not identify a cell phone in Numazaki as teaching the limitation of claim 11 it cannot show how the Numazaki teaches all of the limitations of the claim.

Further, even under Petitioner's own construction the Petition is deficient. The Petition contains no analysis of how Numazaki's transmission unit 356 corresponds with the structure of a mobile phone link or equivalents

IPR2021-00917
Patent 7,933,431 B2

thereof. *See* PO Resp. 37–38. In the Reply Petitioner attempts to overcome this shortcoming by stating that the "transmission unit" "is part of a 'TV telephone' embodiment" in Numazaki; and further arguing that the "transmission unit" is a "functional equivalent for *transmitting information*." Reply 22 (emphasis omitted).

Notably absent from Petitioner's argument is an explanation of how the "transmission unit" is a functional equivalent to a mobile phone link. Thus, Petitioner makes no assertion that the transmission unit is the same as or equivalent to the structure Petitioner has identified in the '431 patent as the relevant structure under 35 U.S.C. §112 ¶ 6. For these reasons, Petitioner has not satisfied its burden with respect to its own claim construction.

As discussed above, the Petition fails to show how Numazaki teaches the limitation of claim 11 whether under our claim construction or Petitioner's.

    G.    *35 U.S.C. § 103(a) – Rhoads*

Petitioner asserts that claims 7, 9, and 11 of the '431 patent would have been obvious over Rhoads. Pet. 42–51. Patent Owner argues that Rhoads is not prior art to the '431 patent. PO Resp. 38–40. For the reasons below, we determine that Rhoads is not prior art to the '431 patent. Therefore, Petitioner cannot show that claims 7, 9, and 11 would have been obvious at the time of the invention over Rhoads.

As noted by Patent Owner:

> An inventor can antedate a reference by showing that the invention was conceived before the effective date of the reference, with diligence to actual or constructive reduction to practice. *In re Steed*, 802 F.3d 1311, 1320 (Fed. Cir. 2015) (citing 37 C.F.R. § 1.131). The critical period in which diligence must be shown begins just prior to the effective date of the reference

IPR2021-00917
Patent 7,933,431 B2

> and ends with the date of a reduction to practice, either actual or
> constructive. *Id.*

PO Resp. 38.

The Petition asserts that Rhoads is prior art to the '431 patent under
35 U.S.C. § 102(e) based on its claim to priority to "U.S. Patent Application
09/343,104 filed June 29, 1999." Pet. 5.

Concerning the priority date of the '431 patent, the Petition states that
"[f]or purposes of this proceeding, Petitioner assumes a priority date of July
8, 1999 (*i.e.,* the filing of the provisional application)." *Id.* at 12; *see also id.*
at 4 ("The '431 Patent claims priority through a chain of applications to U.S.
Provisional Application 60/142,777 filed July 8, 1999.").

As can be seen from the above and based on the positions taken in the
Petition, Rhoads could only be prior art to the '431 patent by a few days,
June 29, 1999 v. July 8, 1999.

In support of conception, diligence and constructive reduction to
practice, Patent Owner provides the Declaration of Timothy R. Pryor (Ex.
2006), named inventor of the'431 patent and the '777 provisional. Ex. 1001,
code (76); Ex. 2005, 1–3. Mr. Pryor testifies:

> 1. I am the sole inventor of the subject matter recited in claims 7,
> 9, and 11 of U.S. Patent No. 7,933,431 (the "'431 Patent"), which
> claims priority to U.S. Provisional Patent Application Serial No.
> 60/142,777 (the "provisional application").
>
> . . .
>
> 4. At the time of filing the provisional application, I was a
> resident of Ontario, Canada. This is stated directly on the patent
> cover sheet for the provisional application. Ex. 2005, p. 1.
>
> 5. At the time of filing the provisional application, Larson &
> Taylor ("Patent Counsel") was located in Alexandria, VA, USA.
> This is stated directly on the patent cover sheet. Ex. 2005, p. 1.

IPR2021-00917
Patent 7,933,431 B2

. . .

> 7. I conceived the subject matter recited in claims 7, 9, and 11 of the '431 Patent no later than June 27, 1999. . . . Specifically, each page of the specification of the provisional application is explicitly dated "6/27/99," showing that the provisional application was drafted, and thus conception had taken place, no later than June 27, 1999.
>
> 8. I was diligent in constructively reducing the invention to practice starting no later than June 27, 1999 (i.e., just prior to the effective filing date of Rhoads). This is evidenced by the preparing/drafting of the provisional application no later than June 27, 1999.
>
> 9. I remained diligent until the subsequent filing of the provisional application approximately 10 days later on July 8, 1999. This short ten day period included both the July 1 federal holiday in Canada ("Canada Day"), where I was a resident at the time, and the July 4 federal holiday in the US, where Patent Counsel was located.

Ex. 2006.

Petitioner does not contest (see Reply 23–24), and we determine that Mr. Pryor's testimony, supported by the '777 provisional, shows that Mr. Pryor conceived of the subject matter in the '777 provisional before the effective filing date of Rhoads, and was diligent in constructively reducing it to practice. As testified by Mr. Pryor, the '777 provisional was prepared by June 27, 1999. Ex. 2006 ¶ 8. This is supported by the '777 provisional itself where each page of the written description includes the date of June 27, 1999. Thus, the evidence shows that conception occurred prior to the filing of Rhoads.

As there are only ten days between June 27, 1999 and the filing on July 8, 1999 this does not evidence any delay in filing the application. This is especially the case because as noted by Mr. Pryor, there were two holidays

IPR2021-00917
Patent 7,933,431 B2

during that ten day period. *Id.* ¶ 9. Thus, the evidence shows that Mr. Pryor and his attorney were diligent in preparing the '777 provisional for filing, which serves as a constructive reduction to practice.

Concerning the issue of whether the '777 provisional provides adequate support for claims 7, 9, and 11 of the '431 patent, Patent Owner relies on the statements in the Petition that "[f]or the purposes of this proceeding, Petitioner assumes a priority date of July 8, 1999 (*i.e.*, the filing date of the provisional application)"). PO Resp. 39 (quoting Pet. 12). Patent Owner also generally points to the '777 provisional for support. *Id.* at 40.

Though Petitioner makes the general allegation that Patent Owner should have provided more detailed analysis, Petitioner's Reply does not identify any particular claim element from claims 7, 9, and 11 of the '431 patent that lacks support in the '777 provisional. Reply 23–24. In response to Petitioner's arguments that Patent Owner should have provided more detailed analysis (*id.* at 23–24), Patent Owner provides a listing of support by claim element (Sur-reply 19–20).

Comparing the '431 patent to the '777 provisional, it can be seen that the disclosures are very similar. *Compare* Ex. 1001, *with* Ex. 2005. One figure was added (Figure 17) to the '431 patent that was not in the '777 provisional, but otherwise there does not appear to be any material difference. *See* Sur-reply 19. This can be determined by a fairly quick review of the documents.

The Petition itself also identifies where the '431 patent provides written description support for the main limitations of claims 7 and 11. This is because the Petition argues that the main claim elements of claim 7 and claim 11 are means plus function claim limitations. Pet. 13–17. The Petition identifies the structure in the '431 patent that Petitioner argues one of skill in

IPR2021-00917
Patent 7,933,431 B2

the art would understand to correspond with the means limitations identified in the claims. *Id.* (citing, *e.g.*, Ex. 1001, 3:15–19, 6:9–18, 7:22–29, 11:54–58, 11:62–67, 12:1–9, 12:46—13:3, 13:36–40, 13:63–67, 17:34–50, Fig. 8B). Petitioner's expert also implicitly admits that the main claim elements of claims 7 and 11 have written description support in the '431 patent. Ex. 1003 ¶¶ 51, 55–56, 58–59, 62. Reviewing the '777 provisional, it can be seen that most, if not all, of the disclosures from the '431 patent relied on by Petitioner and Petitioner's declarant are present in the '777 provisional.

We have reviewed Patent Owner's a listing of support by claim element, and compared the Petition's and Petitioner's declarant's listing of support in the '431 patent to the disclosures of the '777 provisional and determine that the evidence shows that the '777 provisional provides written description support for every limitation of claims 7, 9, and 11.

Further, though the Reply argues that the Patent Owner Response should have provided a more detailed explanation of where the claims find support in the '777 provisional, we determine such explanation was unnecessary. First, Patent Owner properly relied on the Petition's stated position that that "[f]or the purposes of this proceeding, Petitioner assumes a priority date of July 8, 1999 (*i.e.*, the filing date of the provisional application)". PO Resp. 39 (quoting Pet. 12). Thus, the Petition did not call priority into question and even went further to affirmatively "assume" priority to the '777 provisional.

Secondly, the Petition and Petitioner's declarant identified support for the main claim elements of claims 7 and 11 in the '431 patent that are easily identifiable and present in the '777 provisional. Further, the limitation added in claim 9 is closely related to the limitations in claim 7. This can be seen in the Petition where the Petition does not provide any citations to Rhoads for

IPR2021-00917
Patent 7,933,431 B2

claim 9 but merely points to claim 7. *See* Pet. 51. Thus, support for Patent

Owner's position could be readily determined based on the record.

We also determine that by failing to argue in the papers that any

particular claim element lacks support in the '777 provisional, Petitioner

waived such arguments.[9]

For the reasons discussed above, we determine that Rhoads is not

prior art to claims 7, 9, and 11 of the '431 patent. Thus, the Petition cannot

show that claims 7, 9, and 11 would have been obvious at the time of the

invention over Rhoads.

*H.    35 U.S.C. § 103(a) – Doi and Cousins*

Petitioner asserts that claims 7–12 of the '431 patent would have been

obvious over Doi and Cousins. Pet. 17–33. Patent Owner presents a number

of arguments that the Petition is insufficient. PO Resp. 11–24.

We first give a short overview of the asserted prior art, Doi and

Cousins. This is followed by a discussion of Petitioner's position and Patent

Owner's arguments in response.

*1.    Doi*

Doi "relates to a user interface apparatus and an input method of

performing input by image processing." Ex. 1005, 1:9–11. Doi describes a

user interface apparatus that is applicable to, for example, a computer with a

graphical user interface. *Id.* at 7:13–14. The user interface apparatus includes

a display screen to display objects, such as a cursor and application icons,

---

[9] At the hearing, Petitioner requested to introduce new arguments into the
record concerning the support provided by Patent Owner in the Sur-reply.
Tr. 64:15–67:23. We allowed Petitioner to advance the arguments, but did
not rule at that time whether they were improper new arguments. *Id.* at
64:15–65:23. We determine that these arguments are improper new
arguments that should have been advanced in the Reply.

IPR2021-00917
Patent 7,933,431 B2

and an input device is used to input instructions, such as to move the cursor or start an application. *Id.* at 7:14–19. Doi teaches that the input device can receive input via image processing of an object, such as a user's hand, and can replace the use of a computer mouse. *Id.* at 7:19–22. Figure 3, reproduced below shows a display screen and an input device.



Figure 3 "is a view for explaining the relationship between a display device, the housing of the image input unit, and an object." *Id.* at 5:47–49. Figure 2, reproduced below, shows a block diagram of an exemplary image input unit.



Figure 2 shows an image input unit's light-emitting unit (101), reflected light extracting unit (102), and timing controller (103). *Id.* at 7:44–46. Doi describes the light-emitting unit (101) as irradiating light onto an object and the reflected light extracting unit (102) receiving reflected light from the

34

IPR2021-00917
Patent 7,933,431 B2

object. *Id.* at 7:46–51. The timing controller (103) controls the operation timings of the light-emitting unit (101) and the reflected light extracting unit (102) so that a difference between the reflected light received by the reflected light extracting unit (102) and the light produced by the light-emitting unit (101) can be used to correct for a background, thereby permitting extraction of light reflected by an object. *Id.* at 7:51–60. Doi also teaches that the image input unit does not need to have a light-emitting unit but "can have only a light-receiving unit such as a CCD camera." *Id.* at 7:60–62.

Doi further describes interpretation rules for shape interpretation. *Id.* at 8:35–36. For instance, Doi discloses treating the state of a user's open and raised thumb and index finger as indicating cursor movement, treating the state of a user's closed and raised thumb and index finger to indicate selection of an icon, and treating the state of a user's raised thumb and index finger and turned palm as indicating the start of an application. *Id.* at 8:46–58.

### 2. *Cousins*

Cousins is directed to "a multi-purpose portable imaging device" where "[t]he device is small enough to be hand-held . . . and has embedded on its surface at least one sensor." Cousins' system further involves sending the "energy received from the sensors . . . to an advanced computer" where "[t]he data is processed." Ex. 1006, Abst.; *see also id.* at 4:15–34 (Summary of the Invention discussing a "a multi-purpose portable imaging device" and an advanced computer that processes data from the imaging device).

Figure 2, reproduced below, shows a perspective view of a portable multi-purpose imaging device.

IPR2021-00917
Patent 7,933,431 B2



**Figure 2**

Figure 2 is a bottom view of a multi-purpose imaging device (100) including a sensor array (130), such as radar transducers, and a CCD camera (140). *Id.* at 7:10–21. A display can be included on the top side, opposite from the view illustrated. *Id.* at 5:17, Fig. 1.

Cousins teaches that the imaging device may be used to scan an area to produce a representational and accurate 3D map which can be displayed on the device. *Id.* at 6:57–59. Cousins also teaches that the digital data from the portable device can be sent to "an advanced computer" or an "expert machine" for additional processing. *Id.* at Abst., 4:19–21, 13:34. Cousins further explains that the "[p]ortability of imaging device 100 is increased through use of personal communication systems to tap into remote expert systems." *Id.* at 13:65–67.

    *3.    Claim 7*

Petitioner argues that, while Doi "teach[es] most of the subject matter of claim 7," including "a computer having a graphical user interface," "it does not explicitly disclose that such a computer is handheld as recited in the preamble of claim 7." Pet. 18 (emphasis omitted). For this reason, the

IPR2021-00917
Patent 7,933,431 B2

Petition relies on Cousins for teaching a handheld device with a graphical user interface. *Id.* It is this same handheld device of Cousins that the Petition relies on for teaching the claimed housing (*id.* at 22), that houses the computer means and is associated with the camera means (Ex. 1001, 25:63, 26:1).

> Petitioner argues that
>
> *Cousins* explicitly teaches and suggests the combination, as it suggests that "another application consists of using imaging device 100 along with an expert system to read sign language or the like" and that "[h]and gestures can be used to issue commands…."

Pet. 20–21 (citing Ex. 1006, 13:33–47).

Petitioner first argues that Cousins provides an explicit motivation to combine because "*Cousins* states that its imaging device can be used with hand gestures for input to a computer," which is the focus of Doi. *Id.* at 19 (citing Ex. 1006, 13:33–47). Second, Petitioner argues that the combined device would provide the benefit of being smaller. *Id.* at 20. Third, Petitioner argues that "combining the teachings of *Doi* and applying them to the *handheld* apparatus of *Cousins* would have been no more than the simple substitution of one known element for another." *Id.* (citing Ex. 1003 ¶ 80).

Patent Owner argues that there are a number of issues with the proposed combination of Doi and Cousins. PO Resp. 11–22. For example, Patent Owner argues that the reasons to combine provided in the Petition do not consider the actual context of Cousins. *Id.* at 13–14. As noted above, Petitioner argues that Cousins provides an explicit motivation to modify Doi to be a handheld device because "*Cousins* states that its imaging device can be used with hand gestures for input to a computer," which is the focus of Doi. Pet. 19 (citing Ex. 1006, 13:33–47).

IPR2021-00917
Patent 7,933,431 B2

However, Patent Owner correctly notes that Cousins teaches that using hand gestures for input is done with the combination of the handheld imaging device and an "expert system." PO Resp. 13. As noted above, the Petition acknowledges, and relies on, Cousins' teaching of "using imaging device 100 along *with an expert system*" (Pet. 20–21), but the analysis in the Petition completely ignores the "expert system" and only addresses the imaging device. Thus, the Petition fails to establish that the expert system is part of the handheld imaging device.

In response to Patent Owner's arguments, Petitioner argues that Cousins teaches "two types of expert systems . . .: expert systems within the portable device, and remote expert systems." Reply 10. Petitioner explains that Cousins

> mentions "expert systems" in, for example, columns 10, 12, and 13, and only later contemplates "remote expert systems" near the end of column 13. Thus, not all "expert systems" must be "remote" or "physically separate", and a POSITA would have understood expert systems within the handheld device as consistent with Cousins.

*Id.* (citing Ex. 1034 ¶¶ 38–39).

As noted previously, Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC*, 800 F.3d at 1378. At this stage Petitioner must show that the claims are unpatentable by a preponderance of the evidence. Petitioner has not met its burden.

For example, Petitioner merely asserts that the word "remote" means "physically separate" without explanation. Petitioner does not address or explain how "remote" is used in the context of Cousins. Petitioner does not address the specific teachings related to an "expert system" in Cousins or how they would be understood in context. Petitioner does not explain why

IPR2021-00917
Patent 7,933,431 B2

Cousins' teaching of "using imaging device 100 *along with* an expert system" (Pet. 20–21) means that the expert system is within the housing of or part of the imaging device.

Cousins teaches a system where an imaging device can provide the image data, but an expert system is needed to perform processing other than imaging, such as comparing the obtained image to images stored in a database. *See, e.g.*, Ex. 1006, 12:23–27 (discussing using expert systems to identify an organ in an image); *id.* at 13:5–13 (explaining that expert systems can be used to "perform pattern matching of scanned images to a database of images" such as to identify weapons in scanned images at airports); *id.* at 13:33–47 (discussing pattern matching hand signs with an expert system). In each instance the expert system is identified separately from, but used with the imaging device.

Cousins further teaches that "Personal communication systems may be connected to imaging device 100 for connection to a remote database" and that "Portability of imaging device 100 is increased through use of personal communication systems to tap into remote expert systems." *Id.* at 13:63–67. Though Petitioner relies on this use of the word "remote" in the abstract, Petitioner fails to discuss the actual teaching or to address why one of skill in the art would have understood this to mean that non-remote expert systems are within Cousins' handheld imaging device. We find such a position to be unsupported, as well as being based on too many assumptions and asserted implications, to satisfy Petitioner's burden. Though we agree that this implies that some expert systems are farther away from the imaging device than others, we do not agree that this expressly teaches two different types of expert systems. Rather we determine that this supports a finding that

IPR2021-00917
Patent 7,933,431 B2

Cousins' expert systems would be understood to be separate from the imaging device. PO Resp. 13; Ex. 2007 ¶¶ 57–60; Sur-reply 7–8.

Thus, Cousins is similar to Doi, in that Doi also teaches an image input unit which can do some limited processing of sensor data to obtain an image and then sending the data to a separate computer that performs more advanced processing. *See* Ex. 1005, 7:10–8:12, Figs. 1–3. Thus, neither reference teaches a

> Handheld computer apparatus comprising: a housing; . . . [and] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object handheld device

as required by claim 1, because the computer means is not within a housing of the handheld computer apparatus but is a separate device.

We determine that Petitioner's analysis is insufficient to establish that one of skill in the art would understand that Cousins' "expert systems" are within the housing of the handheld imaging device.[10] Therefore, Petitioner fails to establish that the combination of Doi and Cousins teaches all of the limitations of claim 7.

 4. *Claims 8–12*

Claims 8–12 depend from claim 7. As Petitioner fails to establish that the combination of Doi and Cousins teaches all of the limitations of claim 7, it likewise fails to establish the same for claims 8–12 based at least on their dependency from claim 7.

---

[10] The Petition does not rely on Cousins' imaging device alone without the expert system as that is the only embodiment in Cousins related to reading hand gestures. *See* Pet. 19–21 (the only citations to Cousins in the reasons to combine are to Ex. 1006, 13:33–47); *see also* Reply 9–10 (arguing over Cousins' imaging device divorced from the expert systems).

IPR2021-00917
Patent 7,933,431 B2

I. *35 U.S.C. § 103(a) – Doi, Cousins, Parulski*

Petitioner asserts that claim 13 of the '431 patent would have been obvious over Doi, Cousins, and Parulski. Pet. 33–34. Claim 13 depends from claim 7. Petitioner does not rely on Parulski in a manner that would overcome the deficiencies identified above with respect to independent claim 7. Thus, Petitioner has not shown how the combination of Doi, Cousins, and Parulski teaches all of the limitations of claim 13 for at least the same reasons as independent claim 7.

J. *Jurisdiction Over Expired Patents*

Patent Owner argues that the USPTO does not have jurisdiction over expired patents. PO Resp. 1–2. Rather, Patent Owner argues, the USPTO only has jurisdiction over patents with claims that can be amended or cancelled. *Id.* Patent Owner states that, as explained by the Supreme Court, "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts," including for the USPTO to "reexamine—and perhaps cancel—a patent claim in an inter partes review." *Id.* (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1368, 1374 (2018). However, Patent Owner argues that this authority does not extend to expired patents because the public franchise associated with an issued patent no longer exists after expiration. *Id.* at 2. Thus, it is argued, the USPTO no longer has jurisdiction, even though the patent owner "may be entitled to collect damages" for patent infringement, because "the patent owner[] no longer has the right to exclude others" and the USPTO has nothing to cancel or amend. *Id.*

Patent Owner reasons that:

Expiration removes the patent from the [US]PTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts,

IPR2021-00917
Patent 7,933,431 B2

which have exclusive authority to govern claims for damages. If this were not so, the [US]PTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

*Id.*

*Inter partes* review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs.*, 138 S. Ct. at 1374 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear that *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 Fed. Reg. 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board)[11] ("The claim construction standard adopted in this final rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that '[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning').").

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review merely refers to patents, with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline"

---

[11] Available at https://www.federalregister.gov/d/2018-22006/p-13.

makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute or legal precedent that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the Patent Office's authority to take a second look at an earlier administrative grant of a patent ends when the patent term expires even though the rights granted by the patent are not yet exhausted.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.

### K.    *Motion to Strike*

Petitioner also filed a Motion to Strike (Paper 19) and Patent Owner filed an Opposition to the Motion to Strike (Paper 23). The Motion to Strike requests that we strike Ex. 2008 for assertedly being new improper evidence. Paper 19, 1 (citing Consolidated Trial Practice Guide (Nov. 2019)[12] 73–74). The Motion to Strike also requests that we strike § V.A of Patent Owner's Sur-reply (Paper 18). Paper 19, 1.

As this Decision does not rely on or cite to Ex. 2008, we determine that these portions of the Motion to Strike are moot.

Concerning § V.A of Patent Owner's Sur-reply, we deny Petitioner's request to strike. As already discussed herein, Patent Owner's arguments in the Sur-reply related to support for claims 7, 9, and 11 in the '777 provisional (i.e. § V.A) were in direct response to Petitioner's related arguments in the Reply. We do not fault Patent Owner for relying on

---

[12] Available at www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2021-00917
Patent 7,933,431 B2

Petitioner's statement affirmatively "assum[ing]" priority to the '777 provisional. *See* PO Resp. 39 (quoting Pet. 12). Further, the disclosures of the '431 patent and the '777 provisional are very similar and Petitioner in its claim construction laid out and admitted support in the '431 patent for the main claim limitations of claims 7 and 11, with claim 9 closely related to claim 7. Pet. 13–17. Reviewing the '777 provisional, it can be seen that most, if not all, of the disclosures from the '431 patent relied on by Petitioner and Petitioner's declarant are present in the '777 provisional.

Under the facts of the present case, the issue of priority to the '777 provisional was not in issue until Petitioner raised it in the Reply. And thus, Patent Owner's response in the Sur-reply was proper. Petitioner had the opportunity and did challenge the claim to priority in the Reply. But by not addressing any specific claim limitation that was not supported, Petitioner waived the opportunity to make specific arguments in that regard.

For these reasons, Petitioner's Motion to Strike is rendered moot and otherwise denied.


III.    CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that some of the challenged claims are unpatentable, as summarized in the following table:

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 7–9, 11, 12 | 102(e) | Numazaki | 7–9, 12 | 11 |
| 7, 9, 11 | 103(a) | Rhoads | | 7, 9, 11 |
| 7–12 | 103(a) | Doi, Cousins | | 7–12 |
| 13 | 103(a) | Doi, Cousins, Parulski | | 13 |

IPR2021-00917
Patent 7,933,431 B2

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Overall Outcome | | | 7–9, 12 | 10, 11, 13 |

## IV.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 7–9, 12 of U.S. Patent 7,933,431 B2 have been shown to be unpatentable;

FURTHERED ORDERED that claims 11 and 13 of U.S. Patent 7,933,431 B2 have not been shown to be unpatentable;

FURTHERED ORDERED that the portions of Petitioner's Motion to Strike that are not moot are denied; and

FURTHERED ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00917
Patent 7,933,431 B2

FOR PETITIONER:

Raghav Bajaj
David McCombs
Angela Oliver
HAYNES AND BOONE, LLP
Raghav.bajaj.ipr@haynesboone.com
David.mccombs.ipr@haynesboone.com
Angela.oliver.ipr@haynesboone.com

Ashraf Fawzy
Alyssa Holtslander
UNIFIED PATENTS, LLC
afawzy@unifiedpatents.com
alyssa@unifiedpatents.com

FOR PATENT OWNER:

Todd Landis
John Wittensellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com