2023-1444

_____

# United States Court of Appeals for the Federal Circuit

_____

**GESTURE TECHNOLOGY PARTNERS, LLC**
*Appellant,*

v.

**UNIFIED PATENTS, LLC,**
*Appellee*

_____

Appeal from the United States Patent and Trademark Office in *Inter Partes* Review No. IPR2021-00917 – U.S. Patent No. 7,933,431

_____

**OPENING BRIEF OF APPELLANT
GESTURE TECHNOLOGY PARTNERS, LLC**

/s/ Fred I. Williams
Fred I. Williams
WILLIAMS SIMONS & LANDIS PLLC
601 Congress Ave., Suite 600
Austin, TX 78701
Tel. 512.543.1354

Todd E. Landis
WILLIAMS SIMSONS & LANDIS PLLC
2633 McKinney Ave., Suite 130 #366
Dallas, TX 75204
Tel: 512.543.1357

John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
1735 Market Street, Suite A#453
Philadelphia, PA 19103
Tel: 512.543.1373

July 10, 2023

COUNSEL FOR APPELLANT GESTURE TECHNOLOGY PARTNERS, LLC

# PATENT CLAIMS AT ISSUE

Pursuant to FED. CIR. R. 28(a)(12) the patent claims at issue include claims

7-9 and 12 of U.S. Patent No. 7,933,431.

7.    Handheld computer apparatus comprising:

   a housing;

   a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

   computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

   means for controlling a function of said apparatus using said information.

8.    Apparatus according to claim 7, wherein said object is a finger.

9.    Apparatus according to claim 7, further including a display function which is controlled.

12.    Apparatus according to claim 7, further including a light source for illuminating said object.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1444 |
| **Short Case Caption** | Gesture Technology Partners, LLC v. Unified Patents, LLC |
| **Filing Party/Entity** | Gesture Technology Partners, LLC |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/10/2023

Signature: /s/ Fred I. Williams

Name: Fred I. Williams

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Gesture Technology Partners, LLC | N/A | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**FORM 9. Certificate of Interest**                                    Form 9 (p. 3)
                                                                       July 2020

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

---

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable              ☑    Additional pages attached

| See Attachment A |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**Attachment A to Certificate of Interest:**

## 5. Related Cases.

- *Apple Inc. v. Gesture Technology Partners, LLC*, Case No. 2023-1475 (United States Court of Appeals for the Federal Circuit)

- *Gesture Technology Partners, LLC v. Apple Inc.*, 4:22-cv-04806-YGR (U.S. District Court for the Northern District of California)

- *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, 1:22-cv-03535 (U.S. District Court for the Northern District of Illinois)

- *Gesture Technology Partners, LLC v. LG Electronics Inc. et al.*, 2:21-cv-19234-EP-MAH (U.S. District Court for the District of New Jersey)

- *Ex Parte* Reexamination No. 90/014,901 of U.S. Patent No. 7,933,431, before the USPTO (reexam ordered January 11, 2022).

# TABLE OF CONTENTS

I.     STATEMENT OF RELATED CASES...........................................1

II.    JURISDICTIONAL STATEMENT ....................................................1

III.   STATEMENT OF THE ISSUES ........................................................2

IV.   STATEMENT OF THE CASE AND FACTS ...................................2

     A.    Procedural Background ............................................................2

     B.    The Samsung *Ex Parte* Reexamination of the '431 Patent ..................3

     C.    The '431 Patent ......................................................................4

     D.    The Board's Final Written Decision for the '431 Patent ......................6

          1.    The Board Found That the Term "Camera Means" Does Not Require Construction Because the Parties Agreed That the Term Must Encompass a "Camera." ....................................7

          2.    The Board Found That *Numazaki* Anticipates Claim Element [7.2] Even Though *Numazaki* Does Not Disclose a Camera. ....................................7

          3.    The Board Found That *Numazaki* Anticipates Claim Element [7.3] Even Though the Alleged "Computer Means" of *Numazaki* Does Not "Analyz[e] Said Image." ....................10

V.     SUMMARY OF THE ARGUMENT ..............................................11

VI.    STANDARD OF REVIEW ..............................................................13

VII.   ARGUMENT....................................................................................14

     A.    The Board's Finding That *Numazaki* Anticipates Claim 7 of the '431 Patent Is Not Supported by Substantial Evidence. ....................14

          1.    *Numazaki* Does Not Disclose Claim Element [7.3]..................14

              a.    *Numazaki* Fails to Disclose a "Computer Means" That "Analyz[es] Said Image." ........................................14

        b.    *Numazaki* Fails to Disclose a "Computer Means" as Construed under 35 U.S.C. § 112, ¶ 6. ............................19

    2.    *Numazaki* Does Not Disclose Claim Element [7.2]..................22

B.    Claims 8, 9, and 12 Are Patentable. ....................................................26

C.    The Board Erred by Denying Patent Owner's Requests For Additional Discovery Regarding Samsung's Relationship with Petitioner. ..........................................................................................26

D.    The USPTO Does Not Have Jurisdiction Over Expired Patents ........28

VIII.  CONCLUSION AND RELIEF SOUGHT ....................................................29

# TABLE OF AUTHORITIES

**Cases**

*Alarm.com Inc. v. Hirshfeld*,
  26 F.4th 1348 (Fed. Cir. 2022) ........................................................26

*Applications in Internet Time, LLC v. RPX Corp.*,
  897 F.3d 1336 (Fed. Cir. 2018) ......................................................27

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)..........................................................................13

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
  909 F.3d 398 (Fed. Cir. 2018) ........................................................23

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ......................................................20

*In re Glatt Air Techniques, Inc.*,
  630 F.3d 1026 (Fed. Cir. 2011) ......................................................13

*In re Jolley*,
  308 F.3d 1317 (Fed. Cir. 2002) ......................................................13

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ......................................................14

*In re Nuvasive*,
  842 F.3d 1376 (Fed. Cir. 2016) ......................................................14

*In re Rambus, Inc.*,
  753 F.3d 1253 (Fed. Cir. 2014) ......................................................13

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ......................................................13

*In re Vivint, Inc.*,
  14 F.4th 1342 (Fed. Cir. 2021) ......................................................26

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
  780 F.3d 1376 (Fed. Cir. 2015) ......................................................23

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018)......................................................................28

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................18

iv

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*,
  853 F.3d 1272 (Fed. Cir. 2017) ........................................................ 17, 21, 23

**Statutes**

35 U.S.C. § 315(e) ............................................................................................26

**Other Authorities**

*RPX Corp. v AIT*,
  IPR2015-01750, Paper 128 (P.T.A.B. Oct. 2, 2022) (precedential) .............27

*Unified Patents, LLC v. MemoryWeb, LLC*,
  No. IPR2021-01413, Paper 56 (P.T.A.B. Mar. 8, 2023)...............................27

*Unified Patents, LLC v. MemoryWeb, LLC*,
  No. IPR2021-01413, Paper 76 (P.T.A.B. Mar. 22, 2023).............................28

## I.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Gesture Technology Partners, LLC states that no other appeal in or from the same civil action in the lower court was previously before this or any other appellate court.

Cases pending in this or any other court which will directly affect or be directly affected by this Court's decision in the pending appeal are listed below.

- *Apple Inc. v. Gesture Technology Partners, LLC*, Case No. 2023-1475 (United States Court of Appeals for the Federal Circuit)

- *Gesture Technology Partners, LLC v. Apple Inc.,* Case No. 4:22-cv-04806 (N.D. Cal.)

- *Gesture Technology Partners, LLC v. LG Electronics, Inc.,* Case No. 2:21-cv-19234 (D. N.J.)

- *Gesture Technology Partners, LLC v. Motorola Mobility LLC,* Case No. 1:22-cv-03535 (N.D. Ill.)

- *Ex Parte Reexamination* No. 90/014,901 of U.S. Patent No. 7,933,431, before the USPTO (reexam ordered January 11, 2022).

## II.    JURISDICTIONAL STATEMENT

Appellant Gesture Technology Partners, LLC, appeals from the Patent Trial and Appeal Board's final written decision in the *inter partes* review proceeding of U.S. Patent No. 7,933,431 (the "'431 Patent"). The Board had jurisdiction pursuant to 35 U.S.C. § 314. The Board entered the final written decision on November 21, 2022 (the "FWD"). Appx0001-0046.    Appellant Gesture Technology Partners,

1

LLC, filed a timely notice of appeal on January 20, 2023.  Appx0562-0566.  This

Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## III.    STATEMENT OF THE ISSUES

1.    Whether the Board committed reversible error when it found that *Numazaki* anticipates the "computer means" limitation of independent claim 7 of the '431 Patent that requires "analyzing said image."

2.    Whether the Board committed reversible error when it found that *Numazaki* discloses the "camera means" limitation in independent claim 7 of the '431 Patent.

3.    Whether the Board erred by denying Patent Owner's repeated requests for discovery related to whether Samsung Electronics Co., Ltd ("Samsung") is a real party in interest or privy of Petitioner.

4.    Whether the USPTO has jurisdiction over expired patents.

## IV.    STATEMENT OF THE CASE AND FACTS

### A.    Procedural Background

This appeal involves the '431 Patent, which is owned by Appellant Gesture

Technology Partners, LLC ("Patent Owner").  Appx0047-0082.  The '431 Patent

was filed on July 12, 2010, as U.S. Patent Application No. 12/834,281.  Appx0047.

The '431 Patent issued on April 26, 2011.  *Id.*  Appellee Unified Patents, LLC

("Petitioner") filed a petition for *inter partes* review of claims 7-13 of the '431 Patent

on March 5, 2021.  Appx0083-0145 (the "Petition").  The Patent Trial and Appeal

Board (the "Board") authorized *inter partes* review of the challenged claims on

November 22, 2021.  Appx0230-0275.  Patent Owner filed a response to the Petition

on February 14, 2022.  Appx0288-0341.  Petitioner filed a reply on March 16, 2022

(Appx0352-0385), and Patent Owner filed a sur-reply on April 27, 2022 (Appx0386-0417). On August 30, 2022, the Board heard oral argument regarding the Petition and the Parties' briefing. Appx0434-0441. On November 21, 2022, the Board issued a Final Written Decision ("FWD"). Appx0001-0046. The Board concluded that Petitioner "has proven, by a preponderance of the evidence, that some of the challenged claims are unpatentable:"

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Overall Outcome | | | 7–9, 12 | 10, 11, 13 |

Appx0044-45.

### B.    The Samsung *Ex Parte* Reexamination of the '431 Patent

An order granting *ex parte* reexamination of the '431 Patent issued on January 11, 2022. Appx0556-0561. The *ex parte* reexamination was requested by Samsung ("Samsung Reexam"). *Id*. On October 6, 2022, before the FWD issued, Patent Owner requested, via email, that the Board authorize discovery from Petitioner related to whether Samsung is a real party in interest or privy of Petitioner. Appx0556-0561. Patent Owner also requested leave to file a motion to terminate the Samsung Reexam under 35 U.S.C. §§ 315(e) or 325(d). *Id*. At that time, the Board denied the request as premature. *Id*.

On December 6, 2022, after the FWD issued, Patent Owner renewed its request, via email, for discovery and to file a motion to terminate the Samsung Reexam. Appx0556-0561. In response, via email, the Board authorized Patent Owner to "file any motions or petitions concerning *ex parte* reexamination No. 90/014,901 in *ex parte* reexamination No. 90/014,901, rather than in this AIA proceeding, and in accordance with the rules governing *ex parte* reexamination." Appx0557-0558.

On December 12, 2022, Patent Owner requested reconsideration of its request, via email, for discovery and to file a motion to terminate the Samsung Reexam. The Board denied the reconsideration request. Appx0556-0561.

## C.     The '431 Patent

The '431 Patent is titled "Camera Based Sensing In Handheld, Mobile, Gaming, Or Other Devices." Appx0047. The Abstract of the '431 Patent provides an overview of the claimed subject matter: "Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed." *Id.*

The '431 Patent describes the use of computer devices and one or more cameras that "optically sens[e] human input" with applications in a "variety of fields such as computing, gaming, medicine, and education." Appx0070, 2:7-17. In some

4

embodiments, the '431 Patent discloses a handheld device, such as a cell phone, that processes imaging from a person or object to control functions on the handheld device.  Appx0075, 11:62-67.  Figure 8A, which is reproduced below, depicts some embodiments in which a handheld device includes the functionality of the invention:



FIG. 8A

Appx0057 (FIG. 8A).

The '431 Patent describes that the handheld device can "perform a control function by determining [] position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus . . .

or with a camera located in the handheld device, to sense datums or other information external for example to the device." Appx0075, 12:1-9. The '431 Patent describes that the handle device is capable of "acquir[ing] features of an object and us[ing] it to determine something," such as object recognition. Appx0076, 13:5-21. The '431 Patent states that the purpose of some handheld embodiments is "to add functionality to the device, without complicating its base function, and/or alternatively [to] add a method to interact with the device to achieve other purposes." Appx0075, 11:64-67.

### D.    The Board's Final Written Decision for the '431 Patent

The Petition asserted four grounds of unpatentability based on five alleged prior-art references:

> **Ground #1**: Claims 7–12 of the '431 Patent are obvious under 35 U.S.C. § 103(a) over *Doi* in view of *Cousins*.
>
> **Ground #2**: Claim 13 of the '431 Patent is obvious under 35 U.S.C. § 103(a) over *Doi* in view of *Cousins* further in view of *Parulski*.
>
> **Ground #3**: Claims 7–9 and 11–12 of the '431 Patent are anticipated under 35 U.S.C. § 102(e) by *Numazaki*.
>
> **Ground #4**: Claims 7, 9, and 11 of the '431 Patent are obvious under 35 U.S.C. § 103(a) over *Rhoads*.

Appx0092 (Petition p. 5).

The third ground is relevant on appeal:  Petitioner alleged that claims 7-9 and 11-12 of the '431 Patent are anticipated under 35 U.S.C. § 102(e) by U.S. Patent 6,144,366 to Numazaki et al. (filed October 17, 1997; issued November 7, 2000) ("*Numazaki*").  *Id.*

### 1.    The Board Found That the Term "Camera Means" Does Not Require Construction Because the Parties Agreed That the Term Must Encompass a "Camera."

Petitioner argued that term "camera means" requires construction under 35 U.S.C. § 112, ¶6, whereas Patent Owner argued that the term "camera" is a well-known term that connotes specific structure, so such construction is necessary. Appx0010.  The Board decided that it was unnecessary to construe the term "camera means" because "both constructions essentially encompass cameras" and the "resolution of the dispute does not turn on whichever construction we pick." Appx0010.  "[B]oth parties agree that 'camera means' can be satisfied if the prior art teaches a camera."  Appx0017.  Petitioner and Patent Owner also recognized that a camera is a device with the ***function*** of obtaining an image and the ***structure*** of a lens, sensor, and storage.  *See* Appx0373; *see also* Appx2004.

### 2.    The Board Found That *Numazaki* Anticipates Claim Element [7.2] Even Though *Numazaki* Does Not Disclose a Camera.

Claim element [7.2] recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object."  The Board agreed with Petitioner's argument (Appx0124-

0126) that claim element [7.2] of the '431 Patent is anticipated by *Numazaki*. Appx0020-0021. The Board found that *Numazaki* teaches "a window 712 is provided for the lighting unit and the photo-detection sensor unit" to enable the function of "lighting and photo-detecting on an external body." Appx1011 (52:8-14). The Board also found that *Numazaki* teaches that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." *Id*.

According to the FWD, *Numazaki* teaches that "the photodetection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit." Appx1011 (53:22-36). *Numazaki* discloses that in operation "an image is formed on a photo-detection plane of the reflected light extraction unit 102 by a photo-detection optics 107." Appx0991 (11:11-15). The Board concluded that *Numazaki* teaches all the aspects of the camera means claim element, including a camera, without identifying the structure of the camera (i.e., the lens, sensor, and storage). Appx0022. In fact, the Board found that *Numazaki* discloses a "camera means" even though it conceded that "Patent Owner is correct that *Numazaki* does not explicitly say that the 'photo-detection sensor unit' is a camera." Appx0020.

8

The FWD does not identify a camera or the structure of a camera that obtains an image. Instead, the FWD lists five terms disclosed in *Numazaki* to state that the function of a camera is taught without identifying the structure that obtains an image. *See* Appx0020-0021. The following five terms of *Numazaki* are listed in the FWD:

1) "photo-detection sensor unit" Appx0960 (FIG. 78); Appx1011 (52:5-19).

2) "photo-detection section" Appx0960 (FIG. 78); Appx1012 (53:22-36).

3) "CMOS sensors are used as the photo-detection means" *Id*.

4) "reflected light extraction unit" Appx0886 (FIG. 2); Appx0991 (11:9-19).

5) "photo-detection plane" *Id*.



Appx0886 (FIG. 2).

FIG.78



Appx0960 (FIG. 78).  And the Board did not identify any reasoning for why any of those terms necessarily equates to the structure and functionality of a "camera." Appx0017-022.

### 3. The Board Found That *Numazaki* Anticipates Claim Element [7.3] Even Though the Alleged "Computer Means" of *Numazaki* Does Not "Analyz[e] Said Image."

Claim element [7.3] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object."  The Board found that claim element [7.3] of the '431 Patent is anticipated by *Numazaki*.  Appx0022-0026.  The Board relied on the eighth embodiment and Figures 74-79 of *Numazaki* to find that *Numazaki* teaches the "computer means."  Appx0024.  The FWD cites to the discussion of Figure 74 of

the eighth embodiment where "a portable computer generally called note PC" is disclosed in *Numazaki*.  Appx1010 (50:25-29).

The Board recognized Patent Owner's argument that

The alleged "computer means" disclosed in Numazaki <u>cannot </u>analyze target images of an object from one TV camera.  The alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images without a lighting unit to illuminate the object.  And the alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images of an object without circuitry for subtracting one image from another.  Accordingly, Numazaki does not disclose corresponding structure for performing the recited function of [the] claim element.

Appx0024-0025.

But the Board stated that it was "persuaded . . . that Petitioner has adequately shown that Numazaki teaches the claimed computer means" without any explanation on what camera or structure in *Numazaki* the "said image" is obtained from. Appx0025.  Moreover, the FWD is silent as to where "said image" is obtained from and the camera structure that obtains the image necessary for "analyzing said image to determine information concerning a position or movement of said object."

## V.    SUMMARY OF THE ARGUMENT

The Board failed to identify the "camera" of *Numazaki* recited in claim 7 of the '431 Patent.  The Board committed reversible error when it found that *Numazaki* discloses the "camera means" and "computer means" limitations in independent claim 7 of the '431 Patent because the Board's findings are not supported by substantial evidence.  Because the Board's findings as to independent claim 7 are

not supported by substantial evidence, the same result applies to claims 8, 9, and 12, which depend from independent claim 7.

The Board erred in denying Patent Owner's repeated request for discovery as to whether Samsung Electronics Co., Ltd. is a real party in interest or privy of Petitioner. There is no dispute that Samsung is a "member" customer of the Petitioner. *See* Appx0205 ("Apple, Inc. and Samsung Electronics Co., Ltd. are members of Unified Patents"); Appx0217 ("Unified Patents, LLC's ("Petitioner") reply confirms that all district court defendants, except for one, are Unified Members: Apple, Samsung, Huawei, and LG."). Based on that relationship, publicly available information indicates that Samsung is a real party in interest or privy of Petitioner. But Patent Owner was repeatedly denied the opportunity for further discovery into that relationship, which would have supported Patent Owner's request to file a motion to terminate the co-pending *ex parte* reexamination proceeding filed by Samsung. Accordingly, this proceeding should be remanded so that Patent Owner can take further discovery and develop a full record on the issue of whether Samsung Electronics Co., Ltd. is a real party in interest or privy of Petitioner.

The '431 Patent expired in July 2020, long before the IPR Petition was filed on May 14, 2021. When a patent expires, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise

12

that formerly existed through an infringement action in district court.  But because the public franchise no longer exists after patent expiration, the Patent Office has nothing in its authority to cancel or amend.  Accordingly, upon expiration of the '431 Patent, the Board ceased to have jurisdiction over the '431 Patent, so the FWD should be vacated.

## VI.    STANDARD OF REVIEW

Anticipation is a question of fact, reviewed for substantial evidence on appeal. *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014).  "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (internal citations and quotations omitted).  A finding is supported by substantial evidence if "a reasonable mind might accept the evidence as adequate to support" the finding.  *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "In reviewing the record for substantial evidence, this court takes into account evidence that both justifies and detracts from the factual determinations."  *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1029 (Fed. Cir. 2011).  In reaching its decisions, the Board must "make the necessary findings and have an adequate 'evidentiary basis for its findings.'"  *In re*

*Nuvasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (quoting *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002)).

## VII.    ARGUMENT

### A.    The Board's Finding That *Numazaki* Anticipates Claim 7 of the '431 Patent Is Not Supported by Substantial Evidence.

#### 1.    *Numazaki* Does Not Disclose Claim Element [7.3].

Claim element [7.3] recites "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." The Board's finding that *Numazaki* discloses claim element [7.3] should be reversed because it is not supported by substantial evidence. *See* Appx0022-0026.

##### a.    *Numazaki* Fails to Disclose a "Computer Means" That "Analyz[es] Said Image."

The claimed "computer means," whatever it may be, must analyze "said image to determine information concerning a position or movement of said object." The "said image" refers to the image obtained by the "camera means." *Compare* claim element [7.3] *with* claim element [7.2].

Although the FWD is not entirely clear, the Board appears to have found that *Numazaki's* "feature data generation unit" and "photo-detection sensor unit" are the claimed "computer means" and "camera means," respectively. *See* Appx0021-0022. Even if those findings were supported by substantial evidence—they are not— *Numazaki* still fails to disclose that *Numazaki's* "feature data generation unit" (the

14

Board-identified "computer means") analyzes the image allegedly obtained by *Numazaki's* "photo-detection sensor unit" (the Board-identified "camera means"), as claim element [7.3] requires.  For example, there is no drawing in *Numazaki* showing the output of *Numazaki's* "photo-detection sensor unit" (the Board-identified "camera means") being fed to *Numazaki's* "feature data generation unit" (the Board-identified "computer means").  Similarly, there is no disclosure in *Numazaki* regarding the relationship, if any, between *Numazaki's* "feature data generation unit" and *Numazaki's* "photo-detection sensor unit."  Based on this issue alone, *Numazaki* fails to disclose claim element [7.3], and thus *Numazaki* fails to anticipate independent claim 7.

Although the Board does not expressly concede that disclosure is missing from *Numazaki*, the Board does attempt to equate *Numazaki's* "photo-detection sensor unit" to other components in *Numazaki* that have a relationship with *Numazaki*'s "feature data generation unit." Appx0020-0022.  *Numazaki's* "photo-detection sensor unit" is mentioned for the very first time in *Numazaki's* eighth embodiment.  Appx1011-1012.  *Numazaki* discloses that "[t]his eighth embodiment is directed to a system configuration <u>incorporating</u> the information input generation apparatus of the present invention as described in the above embodiments [1-7]." Appx1010 (50:21-24) (emphasis added).  But it is unclear whether *Numazaki's* "photo-detection sensor unit" is a component unique to *Numazaki's* eighth

15

embodiment, or whether *Numazaki's* "photo-detection sensor unit" is a component of an incorporated "information input generation apparatus" from one of embodiments 1-7. *Numazaki* consistently uses the term "lighting unit" across embodiments 1-8. *See*, *e.g.*, Appx0990 (10:29-32) and Appx1011 (52:12-14). Accordingly, there is little doubt that the "lighting unit" in *Numazaki's* eighth embodiment corresponds to the "lighting unit" in, for example, *Numazaki's* first embodiment. But because *Numazaki's* embodiments 1-7 do not mention the "photo-detector sensor unit," *Numazaki's* "photo-detection sensor unit" is unique to *Numazaki's* eighth embodiment. Under this reading, it is erroneous for the Board to equate *Numazaki's* "photo-detection sensor unit" to anything in *Numazaki's* embodiments 1-7.

Even if *Numazaki's* "photo-detection sensor unit" could be equated to one or more components from *Numazaki's* embodiments 1-7 (i.e., if *Numazaki's* "photo-detection sensor unit" were not unique to *Numazaki's* eight embodiment), there are still impediments to satisfying claim element [7.3] under the stringent requirements of anticipation. *Numazaki's* embodiments 1-7 disclose one or more "photo-detection units," a "photo-detection plane," and a "reflected light extraction unit." Appx0990-1011. In its discussion of the "photo-detection sensor unit," the Board references each one of these components. Appx0020-0022. This is not surprising because it is simply not apparent which component(s) in *Numazaki's* embodiments 1-7 equate to

*Numazaki's* "photo-detection sensor unit." This ambiguity is fatal to an anticipation rejection because "it has long been understood that ambiguous references do not, as a matter of law, anticipate a claim." *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017).

To the extent the Board equated *Numazaki's* "photo-detection unit[s]" and/or *Numazaki's* "photo-detection plane" to *Numazaki's* "photo-detection sensor unit" (the Board-identified "camera means"), that does not meet the requirements of claim element [7.3]. *Numazaki* discloses the "the first photo-detection unit 109 and the second photo-detection unit 110 detects the optical image formed on the photo-detection plane." Appx0991 (11:20-22). But *Numazaki* fails to disclose that the image "formed on the photo-detection plane" is ever analyzed by *Numazaki's* "feature data generation unit" (the Board-identified "computer means") for any purpose. Rather, multiple images that are formed on the "photo-detection plane" are simply subtracted from each other to obtain another image that *Numazaki* refers to as the "reflected light image." Appx0991 (11:9-62). The "reflected light image" is not obtained by the "photo-detection plane" or a "photo-detection unit," but rather is determined through the subtraction of the two images (captured at different times) on the same "photo-detection plane." *Id*. *Numazaki* does not analyze an image on the "photo-detection plane" to "determine information concerning position or movement of said object," as claim element [7.3] requires. The only purpose of the

subtraction process is to form a new image.  *See* Appx0407.  Accordingly, *Numazaki* fails to disclose claim element [7.3], and thus fails to anticipate independent claim 7 of the '431 Patent.

To the extent the Board equated *Numazaki's* "reflected light extraction unit" to *Numazaki's* "photo-detection sensor unit," that also does not disclose claim element [7.3].  Again, as discussed above, "said image" in claim element [7.3] is obtained by the "camera means."  Patent Owner asserts the "reflected light extraction unit" cannot be the claimed "camera means."  Although not entirely clear, the Board appeared to adopt Patent Owner's construction that "camera means" should be construed as a "camera:"  "Though the parties disagree as to whether the term ["camera means"] should be construed as means-plus-function limitation under §112 ¶ 6, both constructions essentially <u>encompass cameras</u>, and therefore it is unnecessary for us to construe as resolution of the dispute does not turn on whichever construction we pick."  Appx0010 (emphasis added).

It is undisputed that "the words of a claim are generally given their ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  But there is no evidence in the record that the "ordinary and customary" meaning of "camera" includes a device having a "difference calculation unit" that operates like *Numazaki's* "reflected light extraction unit."  Appx0960 (11:20-61).  In fact, according to Petitioner, "even if [Patent Owner's] construction

18

is accepted, and the word *means* is deleted from the limitation . . . [a] camera is a 'device for obtaining an image' and does so using a lens, sensor, and storage." Appx0373. Patent Owner agrees. Unsurprisingly, a "difference calculation unit" is missing from the Petitioner's definition of "camera." A device with a "difference calculation unit" is not an ordinary camera. Accordingly, *Numazaki's* "reflected light extraction unit," either alone or with *Nuamazaki*'s "photo-detection optics 107," cannot be the claimed "camera means." Thus, it was erroneous for the Board to equate *Numazaki's* "photo-detection sensor unit" (the Board-identified "camera means") to *Numazaki's* "reflected light extraction unit."

In view of the above, the Board's finding that *Numazaki* discloses claim element [7.3] is not supported by substantial evidence. Accordingly, the Board's finding that *Numazaki* anticipates claim 7 should be reversed.

**b.    *Numazaki* Fails to Disclose a "Computer Means" as Construed under 35 U.S.C. § 112, ¶ 6.**

The claimed "computer means" is a component of the "handheld computer apparatus." *Compare* claim element [7.3] *with* claim element 7[preamble]. The Board found that claim element [7.3] is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. Appx0031. The Board also found that the corresponding structure is "a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object," or equivalents thereof. *Id*.

Accordingly, to meet the requirements of claim element [7.3], *Numazaki* must disclose at least a "handheld computer apparatus" having "a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1299 (Fed. Cir. 2009) ("A challenger who seeks to demonstrate that a means-plus-function limitation was present in the prior art must prove that the corresponding structure—or an equivalent—was present in the prior art.").

The Board found that *Numazaki's* "compact portable information device" is the claimed "handheld computer apparatus." Appx0017-Appx0018. The Board also found that *Numazaki's* "compact portable information device" has *Numazaki's* "feature data generation unit" by virtue of Numazaki's "eighth embodiment . . . incorporating the information input generation apparatus of the present invention as described in the above embodiments [1-7]." *See* Appx0022-0026. But *Numazaki* fails to disclose that its "compact portable information device" has a "general purpose computer programmed with an algorithm" that implements *Numazaki's* "feature data generation unit" (the Board-identified "computer means").

Petitioner argued, and the Board agreed, that *Numazaki* discloses a "portable computer generally called a note PC" having a "general purpose computer programmed with an algorithm" that implements *Numazaki's* "feature data

20

generation unit" (the Board-identified "computer means"). *See* Appx0023-0024. Even if *Numazaki's* "note PC" and *Numazaki's* "compact portable information device" are devices under the umbrella of *Numazaki's* "eighth embodiment," they are still different devices. And the Board does not explain how *Numazaki's* "compact portable information device" necessarily has a "general purpose computer programmed with an algorithm" that implements *Numazaki's* "feature data generation unit" (the Board-identified "computer means"). *See* Appx0023-0024. To the contrary, Numazaki's "compact portable information device" may implement the "feature data generation unit" as multiple specialized hardware units to perform the function recited by claim element [7.3]. *See, e.g.*, Appx0905-0908 (FIGS. 21, 22, and 23), Appx0919 (FIG. 35); *see also* Appx2570-2571 (¶ 94). Because the hardware/circuitry inside *Numazaki's* "compact portable information device" in Fig. 78 is not disclosed, the implementation details are ambiguous. Thus, *Numazaki* cannot disclose this claim element because "it has long been understood that ambiguous references do not, as a matter of law, anticipate a claim." *Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017).

In view of the above, the Board's finding that *Numazaki* discloses claim element [7.3] is not supported by substantial evidence. Accordingly, the Board's finding that *Numazaki* anticipates independent claim 7 should be vacated.

## 2. *Numazaki* **Does Not Disclose Claim Element [7.2].**

Claim element [7.2] recites "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object."  The Board's finding that *Numazaki* discloses claim element [7.2] should be reversed because it is not supported by substantial evidence.  *See* Appx0017-0022.  "[B]oth parties agree that 'camera means' can be satisfied if the prior art teaches a camera."  Appx0017.  Petitioner and Patent Owner both recognized that a camera is a device with the ***function*** of obtaining an image and the ***structure*** of a lens, sensor, and storage.  *See* Appx0373; *see also* Appx2004.  But the Board failed to identify a camera or the structure of a camera that obtains an image.  Instead, the Board listed five terms from *Numazaki* and stated they satisfy the function of obtaining an image.  *See* Appx0020-0021.  The following five terms of *Numazaki* listed by the Board include:

1) "photo-detection sensor unit"  Appx0960 (FIG. 78); Appx1011 (52:5-19).

2) "photo-detection section"  Appx0960 (FIG. 78); Appx1012 (53:22-36).

3) "CMOS sensors are used as the photo-detection means"  *Id*.

4) "reflected light extraction unit"  Appx0886 (FIG. 2); Appx0991 (11:9-19).

5) "photo-detection plane"  *Id*.

The Board lacked substantial evidence to support its conclusion that "camera means" was anticipated by *Numazaki* and recognized that the terms listed in the

FWD are not expressly described as cameras. *See*, *e.g.*, Appx0020 ("Patent Owner is correct that *Numazaki* does not explicitly say that the 'photo-detection sensor unit' is a camera.")

"A prior art reference can only anticipate a claim if it discloses all the claimed limitations 'arranged or combined in the same way as in the claim.'" *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015); *see also Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 405 (Fed. Cir. 2018) ("Prior art that must be modified to meet the disputed claim limitation does not anticipate the claim."). The Board's listing of various photo detection terms found in *Numazaki* that lack the structure of a camera (i.e., lens, sensor, and storage) cannot rise to the level of substantial evidence necessary to withstand appeal.

Anticipation of claim element [7.2] of the '431 Patent would require *Numazaki* to describe with "sufficient precision" the "camera means" because "ambiguous references do not, as a matter of law, anticipate a claim." *See Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017). *Numazaki* does not expressly state that any one term identified by the Board (i.e., "photo-detection sensor unit"; "photo-detection section"; "CMOS sensors are used as the photo-detection means"; "reflected light extraction unit"; and "photo-detection plane") is a camera and therefore substantial evidence does not support the Board's

finding that any one term in the FWD is the "camera means" recited in claim 7 of the '431 patent.

*Numazaki* is silent regarding the "photo-detection sensor unit" being or including a camera. *Numazaki* does not disclose that the "photo-detection sensor unit" includes a lens – a necessary structure for a camera. The mere fact that *Numazaki* discloses a "photo-detection sensor unit" capable of "photo-detecting on an external body," Appx1011 (52:9-14), is not sufficiently specific for the photodetection sensor unit" to disclose a camera, as required by the "camera means" element. Further, none of embodiments 1-7 in *Numazaki* disclose a "photo-detection sensor unit," and thus none of embodiments 1-7 disclose the "photo-detection sensor unit" as being or including a camera as required for anticipation.

Regarding embodiment 8, if *Numazaki* had intended for the "photo-detection sensor unit" in FIG. 78 to be or include the "reflected light extract unit 102," *Numazaki* would have explicitly identified it as such. Appx0403. To the extent the Board is attempting to combine the "photo-detection optics 107" and the "reflected light extraction unit 102" in FIG. 2 of *Numazaki* (reproduced below) with the "photo-detection sensor unit" in FIG. 78 (reproduced below) – *Numazaki* does not teach such combination. *See* Appx0322-0324.



Appx0886 (FIG. 2).

FIG.78

Appx0960 (FIG. 78).

In view of the foregoing, the Board's finding that *Numazaki* discloses claim element [7.2] is not supported by substantial evidence. Accordingly, the Board's finding that *Numazaki* anticipates independent claim 7 should be reversed.

**B.     Claims 8, 9, and 12 Are Patentable.**

Claims 8, 9, and 12 depend from and add limitations to claim 7 of the '431

Patent.  The Board's decision that *Numazaki* anticipates claim 7 should be vacated

because it is not supported by substantial evidence; therefore, *Numazaki* fails to

render dependent claims 8, 9, and 12 unpatentable for at least the same reasons.

**C.     The Board Erred by Denying Patent Owner's Requests For Additional Discovery Regarding Samsung's Relationship with Petitioner.**

The estoppel provision of 35 U.S.C. § 315(e)(1) reads,

> The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a), or the real party in interest or privy of the petitioner, may not request or maintain a proceeding before the Office with respect to that claim on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

35 U.S.C. § 315(e)(1) (emphasis added).  A "proceeding before the Office" in section

315(e)(1) includes *ex parte* reexamination.  *See Alarm.com Inc. v. Hirshfeld*, 26

F.4th 1348, 1351-52 (Fed. Cir. 2022) (discussing Section 315(e)(1) applies to *ex*

*parte* reexams).  There is "nothing in the statutes or regulations preventing the Patent

Office from reconsidering a decision ordering *ex parte* reexamination."  *In re Vivint,*

*Inc.*, 14 F.4th 1342, 1351-52 (Fed. Cir. 2021) (emphasis added).

To determine whether Samsung is estopped from maintaining the Samsung

Reexam following the FWD, it is necessary to determine whether Samsung is a real

party in interest or in privy with Petitioner.  The Board denied Patent Owner that

opportunity by repeatedly denying Patent Owner's requests for additional discovery related to Samsung's relationship with Petitioner.

In *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336 (Fed. Cir. 2018) ("*AIT*"), the Court vacated the Board's final written decisions, and remanded the cases to the Board because the Board did not consider the full range of relationships under 35 U.S.C. § 315(b) and under the common law between the Petitioner and third-party Salesforce.com, Inc. ("Salesforce"). *See AIT*, 897 F.3d at 1358. The Court added "the Board may authorize additional discovery relevant to whether Salesforce is *either* a real party of interest *or* a privy" of RPX Corp. *Id*. (emphasis in original). The discovery following remand in *AIT* included confidential documents, the same discovery that the Board denied Patent Owner here. *RPX Corp. v AIT*, IPR2015-01750, Paper 128 (P.T.A.B. Oct. 2, 2022) (precedential). The relationship between Petitioner and Samsung is similar to the relationship between RPX Corp. and Salesforce in *AIT*. Moreover, the Board recently found that Samsung is a real party in interest to Petitioner based on confidential discovery to which the Board denied Patent Owner access. *See Unified Patents, LLC v. MemoryWeb, LLC*, No. IPR2021-01413, Paper 56 p. 34 (P.T.A.B. Mar. 8, 2023) ("ORDERED that Apple, Inc. and Samsung Electronics Co., Ltd. are Real Parties in Interest to this

Proceeding").[1]  Accordingly, Patent Owner requests that the Court remand this case to the Board with instructions that additional discovery be permitted regarding the relationship between Petitioner and Samsung.

### D.     The USPTO Does Not Have Jurisdiction Over Expired Patents

In *Oil States*, the Supreme Court explained that the "decision to *grant* a patent is a matter involving public rights—specifically, the grant of a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018).  "Specifically, patents are public franchises that the Government grants to the inventors of new and useful improvements."  *Id.* (internal quotation marks omitted).  The Court explained that "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts."  *Id.* at 1368.  In exercising its "significant latitude," Congress grants public franchises "subject to the qualification that the PTO has the authority to reexamine—and perhaps cancel—a patent claim in an inter partes review."  *Id.* at 1368, 1374 (internal quotation marks omitted).  Accordingly, so long as the public franchise exists, the

---

[1] The Director vacated the Board's finding regarding real party in interest because the determination was not relevant to the proceeding, without addressing the merits of the determination or the underlying facts:  "The Board should not have determined whether Apple and Samsung are RPIs in this proceeding given that determination was not necessary to resolve the proceeding."  *See Unified Patents, LLC v. MemoryWeb, LLC*, No. IPR2021-01413, Paper 76 p. 5 (P.T.A.B. Mar. 22, 2023)

Patent Office may have jurisdiction to amend and cancel the claims of the patent (e.g., via *inter partes* review).

When a patent expires, however, the public franchise ceases to exist and the franchisee (e.g., the patent owner) no longer has the right to exclude others. At most, the franchisee may be entitled to collect damages from the public franchise that formerly existed through an infringement action in district court. But because the public franchise no longer exists, the Patent Office has nothing in its authority to cancel or amend. Expiration removes the patent from the Patent Office's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the Patent Office would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

The '431 Patent issued in April 2011 and expired in July 2020, long before the IPR Petition was filed on May 14, 2021. With the expiration of the '431 Patent in July 2020, the Board ceased to have jurisdiction over the '431 Patent, and the FWD should be vacated as a result.

## VIII. CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully submits that the Court should reverse the Board's final written decision in IPR2021-00917. Moreover,

Appellant respectfully submits that the Court should reverse and remand the proceeding to allow Patent Owner to take discovery regarding whether Samsung is a real party in interest or privy of Petitioner.  And, finally, Patent Owner respectfully submits that the final written decision in IPR2021-00917 should be vacated because the Board does not have jurisdiction over expired patents.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on July 10, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:    July 10, 2023                */s/ Fred I. Williams*
                                        Fred I. Williams

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2023-1444

**Short Case Caption:** Gesture Technology Partners, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes  5,950  words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/10/2023          Signature: /s/ Fred I. Williams

                          Name: Fred I. Williams

Save for Filing

# ADDENDUM

Trials@uspto.gov                                      Paper 31
571-272-7822                          Entered: November 21, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

UNIFIED PATENTS, LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

---

IPR2021-00917
Patent 7,933,431 B2

---

Before KEVIN F. TURNER, BRENT M. DOUGAL, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
Denying Petitioner's Motion to Strike
*35 U.S.C. § 318(a)*

IPR2021-00917
Patent 7,933,431 B2

## I.    INTRODUCTION

### A.    *Background*

Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review challenging the patentability of claims 7–13 (the "challenged claims") of U.S. Patent No. 7,933,431 B2 (Ex. 1001, "the '431 patent"). Paper 11 ("Dec."). Petitioner, Unified Patents, LLC, filed the request for an *inter partes* review (Paper 1, "Petition" or "Pet."), which Patent Owner, Gesture Technology Partners, LLC, opposed (Papers 6, 8).[1]

After institution, Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 17, "Reply"), and Patent Owner filed a Sur-reply (Paper 18, "Sur-reply"). Petitioner also filed a Motion to Strike (Paper 19) and Patent Owner filed an Opposition to the Motion to Strike (Paper 23). An oral hearing was held on August 30, 2022, and a copy of the transcript was entered into the record. Paper 30 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial. Having reviewed the arguments of the parties and the supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence, that claims 7–9, and 12 are unpatentable. We also determine that Petitioner has *not* shown that claims 10, 11, and 13 are unpatentable.

### B.    *Related Matters*

The parties identify the following as related matters involving the '431 patent:  *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v.*

---

[1] Petitioner also filed a Preliminary Reply. Paper 7.

IPR2021-00917
Patent 7,933,431 B2

*Samsung Electronics Co.*, No. 2:21-cv-00041 (E.D. Tex.); *Gesture*

*Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.);

*Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-

00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics,*

*Inc.*, No. 6:21-cv-00123 (W.D. Tex.); *Gesture Technology Partners, LLC v.*

*Motorola Mobility LLC*, No. 1:22-cv03535 (ND Ill.); and *Gesture*

*Technology Partners, LLC v. Katherine K. Vidal*, No. 1:22-cv-622 (E.D.

VA). Pet. 1; Paper 24, 1–3. Patent Owner identifies the following Board

proceedings as related matters: IPR2021-00920; IPR2021-00922; and

IPR2021-00923. Paper 24, 2–3. Patent Owner also identifies the following

related *Ex Parte* Reexaminations: No. 90/014,900; No. 90/014,901; No.

90/014,902; and No. 90/014,903. *Id.* at 3–4.

    C.    *The '431 Patent*

    The '431 patent "relates to simple input devices for computers,

particularly, but not necessarily, intended for use with 3-D graphically

intensive activities, and operating by optically sensing a human input to a

display screen or other object and/or the sensing of human positions or

orientations." Ex. 1001, 2:7–11. The '431 patent further states that it relates

to "applications in a variety of fields such as computing, gaming, medicine,

and education." *Id.* at 2:15–17. For instance, the '431 patent describes "a

combination of one or more TV cameras (or other suitable electro-optical

sensors) and a computer to provide various position and orientation related

functions of use." *Id.* at 11:54–58.

    Figure 8A, reproduced below, illustrates the control of functions via a

handheld device.

IPR2021-00917
Patent 7,933,431 B2



**FIG. 8A**

Figure 8A shows a perspective view of a cellular phone (800) using a laser spot projector (801) to project a laser spot on a detector (802) in a dashboard (803). *Id.* at 12:17–20. The '431 patent discloses that, alternatively or in conjunction, round dot targets (805, 806, 807) can be sensed on the cellular phone (800), such as by a TV camera (815). *Id.* at 12:20–25.

In another example, the cellular phone (800) can be used to signal a fax unit (824) to print data from the phone by pointing the cellular phone toward the fax unit. *Id.* at 12:42–45. TV camera (815) scans images of the dot targets (805, 806, 807) and a computer (830) analyzes the target images to determine the position and/or orientation or motion of the cellular phone to thereby determine if a command is being issued with movement of the cellular phone. *Id.* at 12:45–51. The computer then commands the fax unit to print if this action is signaled by the position, orientation, or motion of the cellular phone. *Id.* at 12:51–52.

    D.    *Illustrative Claim*

Petitioner challenges claims 7–13 of the '413 patent. Claim 7 is the sole independent claim and is illustrative:

IPR2021-00917
Patent 7,933,431 B2

> 7. Handheld computer apparatus comprising:
>> a housing;
>> a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;
>> computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and
>> means for controlling a function of said apparatus using said information.

Ex. 1001, 25:61–26:5.

## II.    ANALYSIS

### A.    Summary of Issues

In the below analysis, we first address the grounds of unpatentability. We then address jurisdiction over expired patents and end with the Motion to Strike.

### B.    Instituted Grounds

Petitioner asserts the following grounds of unpatentability (Pet. 5), supported by the declaration of Christopher M. Schmandt (Ex. 1003):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 7–9, 11, 12 | 102(e)[2] | Numazaki[3] |
| 7, 9, 11 | 103(a) | Rhoads[4] |
| 7–12 | 103(a) | Doi,[5] Cousins[6] |
| 13 | 103(a) | Doi, Cousins, Parulski[7] |

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103, 112 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA versions.

[3] U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1007).

[4] U.S. Patent Application Publication 2005/0013462 A1, published Jan. 20, 2005 ("Rhoads") (Ex. 1004).

[5] U.S. Patent 6,266,061 B1, issued July 24, 2001 ("Doi") (Ex. 1005).

[6] U.S. Patent 6,417,797 B1, issued July 9, 2002 ("Cousins") (Ex. 1006).

[7] U.S. Patent 5,666,159, issued Sept. 9, 1997 ("Parulski") (Ex. 1008).

IPR2021-00917
Patent 7,933,431 B2

C.    *Legal Standards*

Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

"A claim is anticipated [under 35 U.S.C. § 102] only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Moreover, "[b]ecause the hallmark of anticipation is prior invention, the prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). Whether a reference anticipates is assessed from the perspective of an ordinarily skilled artisan. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003) ("'[T]he dispositive question regarding anticipation [i]s whether one skilled in the art would reasonably understand or infer from the [prior art reference's] teaching' that every claim element was disclosed in that single reference.").

A claim is unpatentable as obvious under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of obviousness based on underlying factual determinations, including (1) the

IPR2021-00917
Patent 7,933,431 B2

scope and content of the prior art; (2) any differences between the prior art and the claims; (3) the level of skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

### D.    *Level of Ordinary Skill*

Petitioner asserts that "[a] person of ordinary skill in the art at and before the priority date for the '431 Patent ('POSITA') would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or a related subject, and one to two years of work experience with human-computer interaction" and that less experience may be necessary with additional education and vice versa. Pet. 9 (citing Ex. 1003 ¶¶ 36–40). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. PO Resp. 6.

We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '431 patent and prior art of record. We adopt this definition for the purposes of this Decision.

### E.    *Claim Construction*

In *inter partes* review, we construe claims using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b) (2021).

IPR2021-00917
Patent 7,933,431 B2

Petitioner provides a number of claim constructions. Pet. 13–17. Patent Owner addresses some of Petitioner's claim constructions, and further argues that the preamble of claim 7 should be limiting. PO Resp. 6–11.

We only address some of the constructions relevant to the current controversy. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### 1.    *Claim 7's Preamble*

The preamble of claim 7 states: "Handheld computer apparatus comprising . . . ." Ex. 1001, 25:61. The Petition does not address whether the preamble of claim 7 is limiting, but rather attempts to show that, independent of whether it is limiting, the preamble is taught by the prior art. *See, e.g.,* Pet. 21 ("To the extent the preamble is limiting, the combined teachings of Doi and Cousins render it obvious").

Patent Owner argues that the preamble should be limiting because it recites essential structure or steps and is "necessary to give life, meaning, and vitality" to claim 7. PO Resp. 6 (quoting *Acceleration Bay, LLC v. Activision Blizzard, Inc.*, 908 F.3d 765, 770 (Fed. Cir. 2018)). Specifically, Patent Owner asserts that claim 7's final limitation refers back to the preamble's "handheld computer apparatus" for antecedent basis. *Id.* at 7. Patent Owner further argues that the '413 patent discloses different embodiments, with some embodiments being in the form of a computer and some embodiments being in the form of a handheld device. *Id.* at 7 (citing Ex. 1001, 12:59–13:7, Fig. 1A). Patent Owner contends that claim 7 claims the latter embodiments because claim 7 recites a handheld device and,

IPR2021-00917
Patent 7,933,431 B2

therefore, "the preamble is necessary to give life, meaning, and vitality to claim 7, consistent with the embodiments that the inventor chose to claim." *Id.* at 7–8.

Petitioner implicitly agrees that the preamble is limiting, but argues that "The Entirety of the Preamble is Not Necessarily a Limitation." Reply 1 (emphasis omitted). Petitioner would have us dissect the single limitation "handheld computer apparatus" and have us only impart weight to the word "apparatus." *Id.* Petitioner provides no support for the idea that a term can be dissected, but rather points to case law where only certain limitations of multiple separate limitations in a preamble were given weight. *Id.* (citing *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323–24 (Fed. Cir. 2015).

We agree that the preamble of claim 7 is limiting. The last clause of claim 7 refers back to the preamble and is understood with reference thereto. The last clause states: "means for controlling a function of *said apparatus* using said information." Ex. 1001, 26:4–5 (emphasis added). "Said apparatus" derives antecedent basis from the "[h]andheld computer apparatus" recited in the preamble. "Said apparatus" does not refer to "apparatus" in the abstract, dissected from the rest of the term. Moreover, the "means for controlling a function of said apparatus" can be understood because of this reference to the handheld computer apparatus.

We disagree with Petitioner that the "handheld computer" portion of the term "[h]andheld computer apparatus" can be ignored. The claim defines the "apparatus" as a "[h]andheld computer apparatus," and we determine that there is no legal basis for us to dissect this phrase. Petitioner argues that the body of claim 7 only refers to the "apparatus" and not to "handheld computer," thus "handheld computer" is not essential. But the term is "[h]andheld computer apparatus" not merely "apparatus," and the body of

IPR2021-00917
Patent 7,933,431 B2

the claim refers back to "*said* apparatus" which is the "[h]andheld computer apparatus."

Thus, we determine that the single term in the preamble, "[h]andheld computer apparatus," is limiting because it recites essential structure and is "necessary to give life, meaning, and vitality" to claim 7.

## 2.    *Camera Means*

Petitioner asserts that claim 7's limitation of "camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 14. Petitioner argues that the limitation's function "is obtaining an image using reflected light of at least one object positioned by a user operating said object" and the corresponding structure "is one or more TV cameras (e.g., TV camera 815) or other suitable electro-optical sensors, and equivalents thereof." *Id.* (citing Ex. 1001, 3:15–29; Ex. 1003 ¶¶ 50–51).

Patent Owner disagrees and argues that:

> This term does not require construction under 35 U.S.C. §112, ¶ 6 because "camera" is a well-known term that connotes specific structure to a POSITA. *See* Ex. 2007, ¶¶ 46-47. The claimed function is "obtaining an image . . . of at least one object." This is what cameras do. *See id.* They obtain images of objects. *See id.*

PO Resp. 8.

Though the parties disagree as to whether the term should be construed as a means-plus-function limitation under §112 ¶ 6, both constructions essentially encompass cameras, and therefore it is unnecessary for us to construe as resolution of the dispute does not turn on whichever construction we pick.

IPR2021-00917
Patent 7,933,431 B2

### 3.    *Computer Means*

Petitioner contends that claim 7's limitation of "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object" is a means-plus-function limitation under §112 ¶ 6. Pet. 15. Petitioner argues that the limitation's function "is analyzing an image to determine information concerning a position or movement of an object" and the corresponding structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object." *Id.* (citing Ex. 1001, 6:9–18, 7:22–29, 12:1–9, 12:46–52, 17:34–50; Ex. 1003 ¶¶ 53–56).

Patent Owner does not address this term in its claim construction section (PO Resp. 6–11), but later argues that a "more accurate function is 'analyzing the image obtained by the camera means to determine information concerning a position or movement of an object'" (*id.* at 33). Thus, Patent Owner implicitly agrees that this term is subject to §112 ¶ 6. Patent Owner does not further explain its position; however, this slight change in function from Petitioner's position seems to merely reflect the fact that "said image" is referring to "obtaining an image" in the prior camera means limitation.

Neither party argues that either description of the function would be dispositive to any issue herein. For example, Petitioner does not address or contest Patent Owner's supplement to the construction. Reply 1–8, 20–22.

We accept and apply Petitioner's construction with Patent Owner's slight modification because it more accurately states the claimed function.

IPR2021-00917
Patent 7,933,431 B2

We further note that the corresponding structure identified by Petitioner further encompasses equivalents thereof. *See* 35 U.S.C. § 112 ¶ 6.

### 4.    *Means for Controlling a Function*

Petitioner argues that claim 7's limitation of "means for controlling a function of said apparatus using said information" is a means-plus-function limitation under §112 ¶ 6. Pet. 15. According to Petitioner, the limitation's function "is controlling a function of said apparatus using said information" and the corresponding structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to" (1) receive position information, (2) correlate the position information with a function of the apparatus, and (3) cause the apparatus to perform the function, wherein the function includes one or more of: (a) a display function, (b) a command to print, (c) an image transmission function, or (d) an e-mail transmission function. *Id.* at 15–16 (citing Ex. 1001, 12:46–52, 12:65–66, 13:36–40, 13:63–67, 26:8–9; Ex. 1003 ¶¶ 58–59).

Patent Owner does not address Petitioner's construction. PO Resp. 6–11. However, as discussed above, we determine that "said apparatus" refers to the handheld computer apparatus in the preamble. Thus, we accept Petitioner's construction with the added requirement that the general purpose computer be a handheld computer apparatus and that the corresponding structure further encompasses equivalents thereof.

### 5.    *Means for Transmitting Information*

Petitioner asserts that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6. Pet. 17. Petitioner argues that the limitation's function "is transmitting information" and the corresponding structure "is a mobile phone link and equivalents thereof." *Id.* (citing Ex. 1001, 12:65–13:3; Ex. 1003 ¶¶ 61–62).

IPR2021-00917
Patent 7,933,431 B2

Patent Owner disagrees only with the identified structure, which it argues should be "a cell phone, and equivalents thereof." PO Resp. 9 (citing Ex. 2007 ¶¶ 49–50).

The District Court for the Eastern District of Texas also addressed this issue. Ex. 2004, 29–32. There the parties argued that the structure should be either "a transmitter" or a "cellular transceiver." *Id.* at 29. However, the District Court found that the only structure identified in the '431 patent for performing the function of "transmitting information" is a cell phone. *Id.* at 30–31. It pointed to the discussion around Figure 8A that states that the handheld device can be a cell phone, and then the discussion around Figure 8B, which we address below. *Id.* Important to the District Court's analysis (*see id.* at 31), the Specification discloses:

> One function is just to acquire an image for transmission via for example the cell phone[']s own connection. This is illustrated in FIG. 8B, where an image of object 849 acquired by camera 850 of cell phone 851 held by user 852 is transmitted over mobile phone link 853 to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

Ex. 1001, 12:65–13:7. Figure 8B is reproduced below.



**FIG. 8B**

IPR2021-00917
Patent 7,933,431 B2

As discussed above, Figure 8B shows cell phone 851 that acquires an image and transmits the image over mobile phone link 853. *Id.* Patent Owner argues, consistent with the finding of the District Court that the cell phone is the disclosed structure that transmits information. PO Resp. 9–11.

Petitioner argues that the "cell phones own connection" and "mobile phone link 853" are the relevant disclosed structure, which Petitioner further defines as "e.g., transmitter hardware–not a complete cellular phone." Reply 6. Petitioner further argues that a transmitter is all that is required to perform the defined function. *Id.* at 6–7.

In Figure 8B, mobile phone link 853 is identified by an arrow as opposed to any internal structure within a cell phone. This is consistent with the context of a "link" or "connection" between the cell phone and some other device. Thus, we determine that neither the "cell phones own connection" nor the "mobile phone link 853" refers to a structure internal to the cell phone. Thus, the only disclosed structure in the '431 patent for performing the function of "transmitting information" is a cell phone.

We decline Petitioner's invitation to define the structure as merely a transmitter. Pet. 17; Reply 6–8. Petitioner does not identify structure in the '431 patent that would support such a finding. Further, Petitioner's position includes transmitters alone and is not limited to transmitters in cell phones even though Petitioner admits that the base disclosure identified in the '431 patent is a cell phone.

Thus, we determine that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under §112 ¶ 6; that the limitation's function "is transmitting information;" and that the corresponding structure is "a cell phone and equivalents thereof."

IPR2021-00917
Patent 7,933,431 B2

    *F.    35 U.S.C. § 102 – Numazaki*

Petitioner argues that Numazaki anticipates claims 7–9, 11, and 12. Pet. 35–42. Patent Owner contends that Numazaki does not disclose all the limitations of independent claim 7, or dependent claim 11. PO Resp. 28–38.

We first give a short overview of the asserted prior art, Numazaki. This is followed by a discussion of Petitioner's position and Patent Owner's arguments in response where we conclude that Petitioner has shown by a preponderance of the evidence that claims 7–9 and 12 are unpatentable, but has not shown that claim 11 is unpatentable.

    *1.    Numazaki*

Numazaki "relates to a method and an apparatus for generating information input in which input information is extracted by obtaining a reflected light image of a target object." Ex. 1007, 1:8–11. Figure 1, reproduced below, depicts a block diagram for an information input generation apparatus.



FIG.1

Figure 1 shows an information input generation apparatus including a lighting unit (101), a reflected light extraction unit (102), a feature data generation unit (103), and a timing signal generation unit (104). *Id.* at 10:23–28. Numazaki describes emitting light from the light emitting unit (101) and

IPR2021-00917
Patent 7,933,431 B2

that the intensity of the light varies in time according to a timing signal from the timing signal generation unit (104). *Id.* at 10:29–31. The light is directed onto a target object and light reflected from the target object is extracted by the reflected light extraction unit (102). *Id.* at 10:31–35. Numazaki teaches that the feature data generation unit (103) extracts feature data from the reflected light image. *Id.* at 10:57–61. Numazaki further teaches operating a computer based on information obtained from the feature data. *Id.* at 10:61–66.

Figure 78, reproduced below, illustrates an information input generation apparatus.

## FIG.78



Figure 78 shows "a compact portable information device" having "a size that can be held by one hand." *Id.* at 52:5–8. The device includes a window (712) for a lighting unit and a photo-detection sensor unit. *Id.* at 52:12–14. Numazaki describes controlling the position of a cursor (714) on a screen by moving a finger (713) in front of the window (712). *Id.* at 52:14–16.

IPR2021-00917
Patent 7,933,431 B2

> ### 2.    Independent Claim 7

Petitioner relies on Numazaki for teaching all of the elements of claim 7. Pet. 36–41. For example, Petitioner relies on Numazaki's compact portable information device in Figure 78 for teaching the handheld computer apparatus of claim 7. *Id.* at 36 (citing Ex. 1007, 52:5–8; Ex. 1003 ¶¶ 139–141); *see also* Ex. 1007, Fig. 78. Petitioner argues that Numazaki teaches a photo-detection sensor unit inside the housing of the compact portable information device which reads on the camera means associated with a housing of the claim. Pet. 36–38 (citing Ex. 1007, 52:8–14, Fig. 78; Ex. 1003 ¶¶ 142–143, 151). Petitioner argues that the feature data generation unit 103 in Numazaki would be understood to be the claimed computer means. *Id.* at 38–39 (citing Ex. 1007, 10:57–61, 16:27–28, 17:19–23, 17:51–56; Ex. 1003 ¶¶ 156–160). Petitioner also argues that Numazaki's teaching of a computer process to use a fingertip to control a cursor reads on the claimed "means for controlling a function of said apparatus using said information." *Id.* at 39–41 (citing Ex. 1007, 26:8–18, 26:23–25, 52:14–16; Ex. 1003 ¶¶ 161–165).

Patent Owner argues that Numazaki does not teach aspects of the camera means and computer means claim elements. PO Resp. 28–36. We address each argument in turn below and then address the claim as a whole.

> #### a)    Camera Means

Claim 7 requires "a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object." Ex. 1001, 25:63–65. Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant structure "is one or more TV cameras (e.g., TV camera 815) or other suitable electro-optical sensors, and equivalents thereof." Pet. 14 (citing Ex. 1001, 3:15–19).

IPR2021-00917
Patent 7,933,431 B2

As noted above, Patent Owner disagrees that 35 U.S.C. § 112 ¶ 6 is implicated, and argues that the camera means merely requires a camera. PO Resp. 8–9. Thus, both parties agree that "camera means" can be satisfied if the prior art teaches a camera (subject to the other limitations of the claim, "associated with said housing," etc.).

Petitioner argues that Numazaki teaches a photo-detection sensor unit inside the housing of the compact portable information device, which reads on the camera means associated with a housing as claimed. Pet. 36–38 (citing Ex. 1007, 52:8–14, Fig. 78; Ex. 1003 ¶¶ 142–143, 151).

Numazaki only provides some details about the photo-detection sensor unit. *See generally* Ex. 1007, 50:25–54:6. However, Petitioner relies on Numazaki's statement that "the disclosure of the first through seventh embodiments applies to the eighth embodiment" for more details about the photo-detection sensor unit. Pet. 37 (quoting Ex. 1007, 50:21–24); *see also* Ex. 1007, 53:22–36 (discussing "the photo-detection section" and then pointing to the prior discussion "as already described in detail above"). In particular, Petitioner equates the photo-detection sensor unit with the reflected light extraction unit (102) and photo-detection optics (107) of the first embodiment. Pet. 37. Petitioner argues that the "'reflected light extraction unit 102' . . . 'extracts the reflected light from the target object.'" *Id.* (quoting Ex. 1007, 10:33–35). And that this extraction is done using photo-detection optics (107). *Id.* (citing Ex. 1007, 11:11–15). Petitioner's declarant testifies that "[a] POSITA would have understood this term [("photo-detection optics")] to be applicable to a visible (or infrared) light camera." Ex. 1003 ¶ 149.

Petitioner concludes that "*Numazaki* discloses the function and corresponding structure of the recited *camera means . . . for obtaining an*

18

IPR2021-00917
Patent 7,933,431 B2

*image using reflected light of at least one object*, as the structure corresponding to the *camera means* limitation includes at least electro-optical sensors, such as those disclosed in *Numazaki*." Pet. 37 (citing Ex. 1003 ¶¶ 148–150).

Patent Owner first argues that "Numazaki is silent regarding the 'photo-detection sensor unit' being or including a camera" and that Numazaki fails to provide any details regarding the function of the photo-detection sensor unit and thus fails to disclose the photo-detection sensor unit obtains an image, as required by this claim element. PO Resp. 29 (citing Ex. 2007 ¶ 86). We disagree.

In support, Patent Owner relies on its declarant, who testifies:

> I reviewed Numazaki in its entirety and it contains no disclosure stating that the "photo-detection sensor unit" is a camera. A POSITA would understand that Numazaki's disclosure that "photo-detection sensor unit" is capable of "photodetecting on an external body" (Ex. 1007, 52:9-14), does not necessarily mean that the "photo-detection sensor unit" is or includes a camera. Photo-detecting an external body does not mean that the "photo-detection sensor unit" captures an image, like a camera.

Ex. 2007 ¶ 86.

Patent Owner's declarant does not further explain his reasoning. For example, the declarant does not discuss why the discussion of photo-detecting "does not necessarily mean that the 'photo-detection sensor unit' is or includes a camera." The disclosure of Numazaki when discussing photo-detecting is directed to taking images; and according to both Patent Owner and their declarant obtaining images "is what cameras do." PO Resp. 8; Ex. 2007 ¶ 47 ("a POSITA would understand that cameras obtain images of objects").

IPR2021-00917
Patent 7,933,431 B2

For example, Numazaki describes a "photo-detecting state" in reference to when a photo-detection unit "detects the optical image." Ex. 1007, 11:20–31; *see also id.* at 11:38–52. Numazaki's eighth embodiment itself states that "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36;[8] *see also e.g., id.* at 10:33–56 (discussing a "photo-detection section" to capture reflected light as an image), 11:9–52, 12:56–65, 15:23–51.

Thus, the testimony of Patent Owner's declarant, which is stated as being based on "Numazaki in its entirety," does not appear to be consistent with how the term "photo-detecting" is used in Numazaki. Read in context, photo-detecting an external body *does* mean that the "photo-detection sensor unit" captures an image, like a camera, because that is how Numazaki uses the term. Thus, though Patent Owner is correct that Numazaki does not explicitly say that the "photo-detection sensor unit" is a camera, it is clear from the disclosure of Numazaki that "photo-detecting" refers to obtaining an image, which is what Patent Owner asserts is the function of a camera.

The function of the photo-detection sensor unit is further taught in a number of locations in Numazaki. For example, Numazaki at 52:8–14 (cited at Pet. 37) teaches that "a window 712 is provided for the lighting unit and the photo-detection sensor unit" to enable the function of "lighting and

---

[8] Numazaki also teaches that "CMOS sensors are used as the photo-detection means" in the eighth embodiment. Ex. 1007, 53:7–18. The '431 patent similarly teaches that "CMOS cameras" can be used to obtain images. Ex. 1001, 5:50–57.

IPR2021-00917
Patent 7,933,431 B2

photo-detecting on an external body." The paragraph continues to teach that "[a] position of a cursor 714 on the screen can be controlled by moving a finger 713 in front of this window 712." Ex. 1007, 52:14–16. As discussed above, Numazaki teaches that in the eighth embodiment "the photo-detection section . . . outputs an image" and "the photo-detection section stores the charges generated by the photo-electric conversion element upon photo-detecting images of the object at a time of light emission by the lighting unit and at a time of no light emission by the lighting unit, . . . , as already described in detail above." *Id.* at 53:22–36.

As will be understood from reviewing Numazaki, Numazaki discloses an eighth embodiment having a number of different portable form factors shown in Figures 74–79, but sharing "a system configuration incorporating the information input generation apparatus of the present invention as described in the above embodiments." *Id.* at 50:19–20. In addition to referring back to prior disclosure, additional details of the information input generation apparatus including the photo-detection section are provided at 52:33–54:6, which also refers back to the "the photo-detection section . . . , as already described in detail above." *Id.* at 53:22–36; *see also* Dec. 15 (explaining that "details about the photo-detection sensor unit" could be found at Ex. 1007, 50:25–54:6).

Thus, the function of the photo-detection sensor unit is taught by Numazaki. Further, this description of the function of the photo-detection sensor unit is consistent with, and points to, Numazaki's more detailed earlier discussion of the reflected light extraction unit and photo-detection optics, which teaches obtaining an image. *See* Ex. 1007, 10:33–35, 11:11–15 ("an image is formed on a photo-detection plane of the reflected light

IPR2021-00917
Patent 7,933,431 B2

extraction unit 102 by a photo-detection optics 107."), 50:21–42, 53:22–36;
Pet. 37.

For the above reasons, Patent Owner's arguments do not identify any shortcomings in the showing by Petitioner that Numazaki teaches all the aspects of the camera means claim element including a camera.

> b)    *Computer Means*

Claim 7 requires "computer means within said housing for analyzing said image to determine information concerning a position or movement of said object." Ex. 1001, 26:1–3. Petitioner argues that this limitation is subject to 35 U.S.C. § 112 ¶ 6, and that the relevant structure "is a general purpose computer programmed with an algorithm to cause the general purpose computer to: (1) analyze target image(s) of an object captured by the camera means; and (2) determine position(s) of the object." Pet. 15 (citing, *e.g.*, Ex. 1001, 12:46–52).

Petitioner argues that Numazaki's feature data generation unit 103 "which 'extracts [] information . . . from the reflected light image'" would be understood to be the claimed computer means. *Id.* at 38–39 (quoting Ex. 1007, 10:57–61). Petitioner argues that the feature data generation unit is "coupled to a digital memory, timing control, and other control components, and is depicted within a computing device; thus, it would be recognized as corresponding to part of a general purpose computing device, consistent with the structure of the recited computer means." *Id.* (citing Ex. 1003 ¶¶ 156–157) (emphasis omitted).

Petitioner further argues, among other things, that consistent with the above computer program, Numazaki teaches "that '[w]hen the hand is used as the target object, it is possible to capture the **information on a position** and a shape of the hand without a contact, so that it is possible to utilize the

IPR2021-00917
Patent 7,933,431 B2

present invention as a means for inputting information.'" *Id.* at 39 (quoting Ex. 1007, 17:19–23).

Patent Owner makes two arguments, that the Petition fails to disclose a general purpose computer, and that the structure of Numazaki is different from that of claim 7. We address each in turn.

### *(1)    General Purpose Computer*

Patent Owner argues that the Petition fails to disclose a general purpose computer under Petitioner's claim construction. PO Resp. 33. Patent Owner argues that this is because the relied-upon "feature data generation unit" in Numazaki includes "numerous specialized units" and "Petitioner has not provided any explanation as to how these specialized units correspond to a 'general purpose computer.'" *Id.* at 33–34 (citing Pet. 38; Ex. 2007 ¶ 94). Patent Owner further argues that "[j]ust because a component is 'coupled to a digital memory, timing control, etc.'" or "'correspond[s] to part of a general purpose computing device' does not mean the component itself is necessarily a general purpose computer." *Id.* at 34.

Petitioner responds that the Petition relies on the eighth embodiment of Numazaki (Reply 21 (citing Pet. 37), which when discussing Figure 74 of the eighth embodiment describes a computer and "**a portable computer** generally called **note PC**" (*id.* (quoting Ex. 1007, 50:25–29)). Petitioner argues that "Numazaki's eighth embodiment, which Petitioner relied upon for claim 7's anticipation, expressly implements the 'feature data generation unit' in a generic 'computer' contrary to [Patent Owner's] arguments." *Id.* (citing Pet. 38–39; Ex. 1034 ¶¶ 76–81).

Patent Owner responds that "*Numazaki* does not disclose that the 'compact portable information device' is a 'generic computer.'" Sur-reply 15 (citing Ex. 1007, 52:5–19). Patent Owner does not contest that Numazaki

23

teaches that the eighth embodiment can be implemented in a generic computer, or that the Petition relies on the eighth embodiment. Patent Owner merely contests that the "compact portable information device" or the device shown in Figure 78 is not expressly taught as a generic computer.

As discussed above, Numazaki uses Figures 74–79 to show different form factors of the eighth embodiment. *See* Ex. 1007, 50:19–20. As demonstrated by Petitioner, Numazaki teaches that the eighth embodiment can be implemented in a general purpose computer. This is in direct contrast to Patent Owner's argument that the feature data generation unit is not "necessarily" implemented in a general purpose computer. PO Resp. 34. We further determine that Petitioner's argument and evidence shows what one of skill would understand that Numazaki teaches that the feature data generation unit is implemented in a general purpose computer.

*(2)    Structure of Numazaki*

Patent Owner argues that:

Numazaki requires: (1) two, not one, photo-detection units; (2) a lighting unit for illumination; (3) timing circuitry that selectively activates the lighting unit based on which photo-detection unit is active; and (4) circuitry for subtracting one image from another. Simply put, this is fundamentally different than the apparatus recited in claim 7.

PO Resp. 35; *see id.* at 34–35 (describing Numazaki in more detail) (citing Ex. 1007, 10:57–66, 11:20–56, Fig. 2).

Patent Owner further argues that:

The alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images of an object from one TV camera. The alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images without a lighting unit to illuminate the object. And the alleged "computer means" disclosed in Numazaki <u>cannot</u> analyze target images of an object without

IPR2021-00917
Patent 7,933,431 B2

circuitry for subtracting one image from another. Accordingly, Numazaki does not disclose corresponding structure for performing the recited function of [the] claim element.

*Id.* at 35–36 (internal citations omitted).

We are persuaded, however, that Petitioner has adequately shown that Numazaki teaches the claimed computer means.

Patent Owner appears to argue that the camera means requires one camera and that the computer means analyzes images from only that one camera. *Id.* Patent Owner does not identify why the claim should be *limited* to one camera or one image.

Petitioner argued in its claim construction that the structure in the '431 patent for the camera means is "one or more TV cameras (or other suitable electro-optical sensors)." Ex. 1001, 3:17–18; Pet. 14. Patent Owner argued that "'[a] camera means' is properly construed as 'a camera.'" PO Resp. 9. Unless a more limited construction is indicated by the specification or prosecution history, the indefinite article "a" or "an" is construed in a claim to mean "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).

Moreover, we find that the '431 patent appears to expressly contemplate one or more TV cameras. *See* Ex. 1001, 3:25 ("A stereo pair of cameras 100 and 101"), 3:44 ("a three camera arrangement can be used"). Patent Owner does not identify, and we were not able to find, any disclosure in the '431 patent that these multiple cameras are used to obtain only a single image to support Patent Owner's argument that the claim should be limited to either a single camera or a single image.

IPR2021-00917
Patent 7,933,431 B2

Thus, based on the record, the claim encompasses one or more cameras for obtaining one or more images, and analyzing those one or more images.

Second, as to Patent Owner's argument that Numazaki requires a lighting unit for illumination, claim 7 uses the term "comprising" to create an "open ended" claim. "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Thus, the presence of a lighting unit is not excluded from the claim. Rather, the '431 patent teaches the use of LEDs "to illuminate [associated] targets" and claim 12, which depends from claim 7, expressly requires "a light source for illuminating said object." Ex. 1001, 3:34–35, 26:14–15.

Third, it is not clear what relevance Patent Owner's following statement has to the claim: "Numazaki cannot analyze target images of an object without circuitry for subtracting one image from another." This level of detail on how the target images are analyzed by the computer does not appear to be implicated by the current claim construction. Thus, even if true, the statement does not identify errors in the Petition.

<em>c)    Conclusion as to Claim 7</em>

After review of the arguments and evidence, and further in view of the above discussion, we determine that the Petition has shown, by a preponderance of the evidence, that claim 7 is unpatentable as anticipated by Numazaki.

<em>3.    Dependent Claims 8, 9, 12</em>

Petitioner argues that Numazaki anticipates dependent claims 8, 9, and 12. Pet. 41–42 (citing Ex. 1007, 10:29–31, Fig. 78; Ex. 1003 ¶¶ 166–

26

IPR2021-00917
Patent 7,933,431 B2

170, 175–177). Patent Owner relies on its arguments over claim 7 for the patentability of these claims. PO Resp. 36. We have reviewed Petitioner's assertions and the supporting evidence, and determine that Petitioner has established by a preponderance of the evidence that claims 8, 9, and 12 are unpatentable.

### 4.    *Dependent Claim 11*

Dependent claim 11 recites "Apparatus according to claim 7, further including means for transmitting information." Ex. 1001, 26:12–13. As noted previously, Petitioner argues that the "means for transmitting information" is subject to 35 U.S.C. § 112 ¶ 6, and that "[t]he structure corresponding to this function is a mobile phone link and equivalents thereof." Pet. 17 (citing Ex. 1001, 12:65–13:3).

We determine above that claim 11's limitation of "means for transmitting information" is a means-plus-function limitation under 35 U.S.C. §112 ¶ 6; that the limitation's function "is transmitting information;" and that the corresponding structure is "a cell phone and equivalents thereof."

Petitioner argues that "*Numazaki* discloses this limitation." *Id.* at 42. This is because "*Numazaki* describes a 'transmission unit 356' which 'transmits the extracted image.'" *Id.* (quoting Ex. 1007, 40:45–49); *see also* Ex. 1003 ¶ 172 (Petitioner's Declarant making an identical statement).

As the Petition does not identify a cell phone in Numazaki as teaching the limitation of claim 11 it cannot show how the Numazaki teaches all of the limitations of the claim.

Further, even under Petitioner's own construction the Petition is deficient. The Petition contains no analysis of how Numazaki's transmission unit 356 corresponds with the structure of a mobile phone link or equivalents

IPR2021-00917
Patent 7,933,431 B2

thereof. *See* PO Resp. 37–38. In the Reply Petitioner attempts to overcome this shortcoming by stating that the "transmission unit" "is part of a 'TV telephone' embodiment" in Numazaki; and further arguing that the "transmission unit" is a "functional equivalent for *transmitting information*." Reply 22 (emphasis omitted).

Notably absent from Petitioner's argument is an explanation of how the "transmission unit" is a functional equivalent to a mobile phone link. Thus, Petitioner makes no assertion that the transmission unit is the same as or equivalent to the structure Petitioner has identified in the '431 patent as the relevant structure under 35 U.S.C. §112 ¶ 6. For these reasons, Petitioner has not satisfied its burden with respect to its own claim construction.

As discussed above, the Petition fails to show how Numazaki teaches the limitation of claim 11 whether under our claim construction or Petitioner's.

G.    *35 U.S.C. § 103(a) – Rhoads*

Petitioner asserts that claims 7, 9, and 11 of the '431 patent would have been obvious over Rhoads. Pet. 42–51. Patent Owner argues that Rhoads is not prior art to the '431 patent. PO Resp. 38–40. For the reasons below, we determine that Rhoads is not prior art to the '431 patent. Therefore, Petitioner cannot show that claims 7, 9, and 11 would have been obvious at the time of the invention over Rhoads.

As noted by Patent Owner:

> An inventor can antedate a reference by showing that the invention was conceived before the effective date of the reference, with diligence to actual or constructive reduction to practice. *In re Steed*, 802 F.3d 1311, 1320 (Fed. Cir. 2015) (citing 37 C.F.R. § 1.131). The critical period in which diligence must be shown begins just prior to the effective date of the reference

IPR2021-00917
Patent 7,933,431 B2

> and ends with the date of a reduction to practice, either actual or
> constructive. *Id.*

PO Resp. 38.

The Petition asserts that Rhoads is prior art to the '431 patent under
35 U.S.C. § 102(e) based on its claim to priority to "U.S. Patent Application
09/343,104 filed June 29, 1999." Pet. 5.

Concerning the priority date of the '431 patent, the Petition states that
"[f]or purposes of this proceeding, Petitioner assumes a priority date of July
8, 1999 (*i.e.,* the filing of the provisional application)." *Id.* at 12; *see also id.*
at 4 ("The '431 Patent claims priority through a chain of applications to U.S.
Provisional Application 60/142,777 filed July 8, 1999.").

As can be seen from the above and based on the positions taken in the
Petition, Rhoads could only be prior art to the '431 patent by a few days,
June 29, 1999 v. July 8, 1999.

In support of conception, diligence and constructive reduction to
practice, Patent Owner provides the Declaration of Timothy R. Pryor (Ex.
2006), named inventor of the '431 patent and the '777 provisional. Ex. 1001,
code (76); Ex. 2005, 1–3. Mr. Pryor testifies:

> 1. I am the sole inventor of the subject matter recited in claims 7,
> 9, and 11 of U.S. Patent No. 7,933,431 (the "'431 Patent"), which
> claims priority to U.S. Provisional Patent Application Serial No.
> 60/142,777 (the "provisional application").
>
> . . .
>
> 4. At the time of filing the provisional application, I was a
> resident of Ontario, Canada. This is stated directly on the patent
> cover sheet for the provisional application. Ex. 2005, p. 1.
>
> 5. At the time of filing the provisional application, Larson &
> Taylor ("Patent Counsel") was located in Alexandria, VA, USA.
> This is stated directly on the patent cover sheet. Ex. 2005, p. 1.

IPR2021-00917
Patent 7,933,431 B2

. . .

> 7. I conceived the subject matter recited in claims 7, 9, and 11 of the '431 Patent no later than June 27, 1999. . . . Specifically, each page of the specification of the provisional application is explicitly dated "6/27/99," showing that the provisional application was drafted, and thus conception had taken place, no later than June 27, 1999.

> 8. I was diligent in constructively reducing the invention to practice starting no later than June 27, 1999 (i.e., just prior to the effective filing date of Rhoads). This is evidenced by the preparing/drafting of the provisional application no later than June 27, 1999.

> 9. I remained diligent until the subsequent filing of the provisional application approximately 10 days later on July 8, 1999. This short ten day period included both the July 1 federal holiday in Canada ("Canada Day"), where I was a resident at the time, and the July 4 federal holiday in the US, where Patent Counsel was located.

Ex. 2006.

Petitioner does not contest (*see* Reply 23–24), and we determine that Mr. Pryor's testimony, supported by the '777 provisional, shows that Mr. Pryor conceived of the subject matter in the '777 provisional before the effective filing date of Rhoads, and was diligent in constructively reducing it to practice. As testified by Mr. Pryor, the '777 provisional was prepared by June 27, 1999. Ex. 2006 ¶ 8. This is supported by the '777 provisional itself where each page of the written description includes the date of June 27, 1999. Thus, the evidence shows that conception occurred prior to the filing of Rhoads.

As there are only ten days between June 27, 1999 and the filing on July 8, 1999 this does not evidence any delay in filing the application. This is especially the case because as noted by Mr. Pryor, there were two holidays

during that ten day period. *Id.* ¶ 9. Thus, the evidence shows that Mr. Pryor and his attorney were diligent in preparing the '777 provisional for filing, which serves as a constructive reduction to practice.

Concerning the issue of whether the '777 provisional provides adequate support for claims 7, 9, and 11 of the '431 patent, Patent Owner relies on the statements in the Petition that "[f]or the purposes of this proceeding, Petitioner assumes a priority date of July 8, 1999 (*i.e.*, the filing date of the provisional application)"). PO Resp. 39 (quoting Pet. 12). Patent Owner also generally points to the '777 provisional for support. *Id.* at 40.

Though Petitioner makes the general allegation that Patent Owner should have provided more detailed analysis, Petitioner's Reply does not identify any particular claim element from claims 7, 9, and 11 of the '431 patent that lacks support in the '777 provisional. Reply 23–24. In response to Petitioner's arguments that Patent Owner should have provided more detailed analysis (*id.* at 23–24), Patent Owner provides a listing of support by claim element (Sur-reply 19–20).

Comparing the '431 patent to the '777 provisional, it can be seen that the disclosures are very similar. *Compare* Ex. 1001, *with* Ex. 2005. One figure was added (Figure 17) to the '431 patent that was not in the '777 provisional, but otherwise there does not appear to be any material difference. *See* Sur-reply 19. This can be determined by a fairly quick review of the documents.

The Petition itself also identifies where the '431 patent provides written description support for the main limitations of claims 7 and 11. This is because the Petition argues that the main claim elements of claim 7 and claim 11 are means plus function claim limitations. Pet. 13–17. The Petition identifies the structure in the '431 patent that Petitioner argues one of skill in

IPR2021-00917
Patent 7,933,431 B2

the art would understand to correspond with the means limitations identified in the claims. *Id.* (citing, *e.g.*, Ex. 1001, 3:15–19, 6:9–18, 7:22–29, 11:54–58, 11:62–67, 12:1–9, 12:46—13:3, 13:36–40, 13:63–67, 17:34–50, Fig. 8B). Petitioner's expert also implicitly admits that the main claim elements of claims 7 and 11 have written description support in the '431 patent. Ex. 1003 ¶¶ 51, 55–56, 58–59, 62. Reviewing the '777 provisional, it can be seen that most, if not all, of the disclosures from the '431 patent relied on by Petitioner and Petitioner's declarant are present in the '777 provisional.

We have reviewed Patent Owner's a listing of support by claim element, and compared the Petition's and Petitioner's declarant's listing of support in the '431 patent to the disclosures of the '777 provisional and determine that the evidence shows that the '777 provisional provides written description support for every limitation of claims 7, 9, and 11.

Further, though the Reply argues that the Patent Owner Response should have provided a more detailed explanation of where the claims find support in the '777 provisional, we determine such explanation was unnecessary. First, Patent Owner properly relied on the Petition's stated position that that "[f]or the purposes of this proceeding, Petitioner assumes a priority date of July 8, 1999 (*i.e.*, the filing date of the provisional application)". PO Resp. 39 (quoting Pet. 12). Thus, the Petition did not call priority into question and even went further to affirmatively "assume" priority to the '777 provisional.

Secondly, the Petition and Petitioner's declarant identified support for the main claim elements of claims 7 and 11 in the '431 patent that are easily identifiable and present in the '777 provisional. Further, the limitation added in claim 9 is closely related to the limitations in claim 7. This can be seen in the Petition where the Petition does not provide any citations to Rhoads for

IPR2021-00917
Patent 7,933,431 B2

claim 9 but merely points to claim 7. *See* Pet. 51. Thus, support for Patent Owner's position could be readily determined based on the record.

We also determine that by failing to argue in the papers that any particular claim element lacks support in the '777 provisional, Petitioner waived such arguments.[9]

For the reasons discussed above, we determine that Rhoads is not prior art to claims 7, 9, and 11 of the '431 patent. Thus, the Petition cannot show that claims 7, 9, and 11 would have been obvious at the time of the invention over Rhoads.

*H.    35 U.S.C. § 103(a) – Doi and Cousins*

Petitioner asserts that claims 7–12 of the '431 patent would have been obvious over Doi and Cousins. Pet. 17–33. Patent Owner presents a number of arguments that the Petition is insufficient. PO Resp. 11–24.

We first give a short overview of the asserted prior art, Doi and Cousins. This is followed by a discussion of Petitioner's position and Patent Owner's arguments in response.

*1.    Doi*

Doi "relates to a user interface apparatus and an input method of performing input by image processing." Ex. 1005, 1:9–11. Doi describes a user interface apparatus that is applicable to, for example, a computer with a graphical user interface. *Id.* at 7:13–14. The user interface apparatus includes a display screen to display objects, such as a cursor and application icons,

---

[9] At the hearing, Petitioner requested to introduce new arguments into the record concerning the support provided by Patent Owner in the Sur-reply. Tr. 64:15–67:23. We allowed Petitioner to advance the arguments, but did not rule at that time whether they were improper new arguments. *Id.* at 64:15–65:23. We determine that these arguments are improper new arguments that should have been advanced in the Reply.

IPR2021-00917
Patent 7,933,431 B2

and an input device is used to input instructions, such as to move the cursor or start an application. *Id.* at 7:14–19. Doi teaches that the input device can receive input via image processing of an object, such as a user's hand, and can replace the use of a computer mouse. *Id.* at 7:19–22. Figure 3, reproduced below shows a display screen and an input device.



Figure 3 "is a view for explaining the relationship between a display device, the housing of the image input unit, and an object." *Id.* at 5:47–49. Figure 2, reproduced below, shows a block diagram of an exemplary image input unit.



Figure 2 shows an image input unit's light-emitting unit (101), reflected light extracting unit (102), and timing controller (103). *Id.* at 7:44–46. Doi describes the light-emitting unit (101) as irradiating light onto an object and the reflected light extracting unit (102) receiving reflected light from the

34

object. *Id.* at 7:46–51. The timing controller (103) controls the operation timings of the light-emitting unit (101) and the reflected light extracting unit (102) so that a difference between the reflected light received by the reflected light extracting unit (102) and the light produced by the light-emitting unit (101) can be used to correct for a background, thereby permitting extraction of light reflected by an object. *Id.* at 7:51–60. Doi also teaches that the image input unit does not need to have a light-emitting unit but "can have only a light-receiving unit such as a CCD camera." *Id.* at 7:60–62.

Doi further describes interpretation rules for shape interpretation. *Id.* at 8:35–36. For instance, Doi discloses treating the state of a user's open and raised thumb and index finger as indicating cursor movement, treating the state of a user's closed and raised thumb and index finger to indicate selection of an icon, and treating the state of a user's raised thumb and index finger and turned palm as indicating the start of an application. *Id.* at 8:46–58.

### 2. *Cousins*

Cousins is directed to "a multi-purpose portable imaging device" where "[t]he device is small enough to be hand-held . . . and has embedded on its surface at least one sensor." Cousins' system further involves sending the "energy received from the sensors . . . to an advanced computer" where "[t]he data is processed." Ex. 1006, Abst.; *see also id.* at 4:15–34 (Summary of the Invention discussing a "a multi-purpose portable imaging device" and an advanced computer that processes data from the imaging device).

Figure 2, reproduced below, shows a perspective view of a portable multi-purpose imaging device.

IPR2021-00917
Patent 7,933,431 B2



**Figure 2**

Figure 2 is a bottom view of a multi-purpose imaging device (100) including a sensor array (130), such as radar transducers, and a CCD camera (140). *Id.* at 7:10–21. A display can be included on the top side, opposite from the view illustrated. *Id.* at 5:17, Fig. 1.

Cousins teaches that the imaging device may be used to scan an area to produce a representational and accurate 3D map which can be displayed on the device. *Id.* at 6:57–59. Cousins also teaches that the digital data from the portable device can be sent to "an advanced computer" or an "expert machine" for additional processing. *Id.* at Abst., 4:19–21, 13:34. Cousins further explains that the "[p]ortability of imaging device 100 is increased through use of personal communication systems to tap into remote expert systems." *Id.* at 13:65–67.

> 3.    *Claim 7*

Petitioner argues that, while Doi "teach[es] most of the subject matter of claim 7," including "a computer having a graphical user interface," "it does not explicitly disclose that such a computer is handheld as recited in the preamble of claim 7." Pet. 18 (emphasis omitted). For this reason, the

IPR2021-00917
Patent 7,933,431 B2

Petition relies on Cousins for teaching a handheld device with a graphical user interface. *Id.* It is this same handheld device of Cousins that the Petition relies on for teaching the claimed housing (*id.* at 22), that houses the computer means and is associated with the camera means (Ex. 1001, 25:63, 26:1).

> Petitioner argues that
>
> *Cousins* explicitly teaches and suggests the combination, as it suggests that "another application consists of using imaging device 100 along with an expert system to read sign language or the like" and that "[h]and gestures can be used to issue commands…."

Pet. 20–21 (citing Ex. 1006, 13:33–47).

Petitioner first argues that Cousins provides an explicit motivation to combine because "*Cousins* states that its imaging device can be used with hand gestures for input to a computer," which is the focus of Doi. *Id.* at 19 (citing Ex. 1006, 13:33–47). Second, Petitioner argues that the combined device would provide the benefit of being smaller. *Id.* at 20. Third, Petitioner argues that "combining the teachings of *Doi* and applying them to the *handheld* apparatus of *Cousins* would have been no more than the simple substitution of one known element for another." *Id.* (citing Ex. 1003 ¶ 80).

Patent Owner argues that there are a number of issues with the proposed combination of Doi and Cousins. PO Resp. 11–22. For example, Patent Owner argues that the reasons to combine provided in the Petition do not consider the actual context of Cousins. *Id.* at 13–14. As noted above, Petitioner argues that Cousins provides an explicit motivation to modify Doi to be a handheld device because "*Cousins* states that its imaging device can be used with hand gestures for input to a computer," which is the focus of Doi. Pet. 19 (citing Ex. 1006, 13:33–47).

IPR2021-00917
Patent 7,933,431 B2

However, Patent Owner correctly notes that Cousins teaches that using hand gestures for input is done with the combination of the handheld imaging device and an "expert system." PO Resp. 13. As noted above, the Petition acknowledges, and relies on, Cousins' teaching of "using imaging device 100 along *with an expert system*" (Pet. 20–21), but the analysis in the Petition completely ignores the "expert system" and only addresses the imaging device. Thus, the Petition fails to establish that the expert system is part of the handheld imaging device.

In response to Patent Owner's arguments, Petitioner argues that Cousins teaches "two types of expert systems . . .: expert systems within the portable device, and remote expert systems." Reply 10. Petitioner explains that Cousins

> mentions "expert systems" in, for example, columns 10, 12, and 13, and only later contemplates "remote expert systems" near the end of column 13. Thus, not all "expert systems" must be "remote" or "physically separate", and a POSITA would have understood expert systems within the handheld device as consistent with Cousins.

*Id.* (citing Ex. 1034 ¶¶ 38–39).

As noted previously, Petitioner bears the burden to demonstrate unpatentability. *Dynamic Drinkware, LLC*, 800 F.3d at 1378. At this stage Petitioner must show that the claims are unpatentable by a preponderance of the evidence. Petitioner has not met its burden.

For example, Petitioner merely asserts that the word "remote" means "physically separate" without explanation. Petitioner does not address or explain how "remote" is used in the context of Cousins. Petitioner does not address the specific teachings related to an "expert system" in Cousins or how they would be understood in context. Petitioner does not explain why

IPR2021-00917
Patent 7,933,431 B2

Cousins' teaching of "using imaging device 100 *along with* an expert system" (Pet. 20–21) means that the expert system is within the housing of or part of the imaging device.

Cousins teaches a system where an imaging device can provide the image data, but an expert system is needed to perform processing other than imaging, such as comparing the obtained image to images stored in a database. *See, e.g.*, Ex. 1006, 12:23–27 (discussing using expert systems to identify an organ in an image); *id.* at 13:5–13 (explaining that expert systems can be used to "perform pattern matching of scanned images to a database of images" such as to identify weapons in scanned images at airports); *id.* at 13:33–47 (discussing pattern matching hand signs with an expert system). In each instance the expert system is identified separately from, but used with the imaging device.

Cousins further teaches that "Personal communication systems may be connected to imaging device 100 for connection to a remote database" and that "Portability of imaging device 100 is increased through use of personal communication systems to tap into remote expert systems." *Id.* at 13:63–67. Though Petitioner relies on this use of the word "remote" in the abstract, Petitioner fails to discuss the actual teaching or to address why one of skill in the art would have understood this to mean that non-remote expert systems are within Cousins' handheld imaging device. We find such a position to be unsupported, as well as being based on too many assumptions and asserted implications, to satisfy Petitioner's burden. Though we agree that this implies that some expert systems are farther away from the imaging device than others, we do not agree that this expressly teaches two different types of expert systems. Rather we determine that this supports a finding that

IPR2021-00917
Patent 7,933,431 B2

Cousins' expert systems would be understood to be separate from the imaging device. PO Resp. 13; Ex. 2007 ¶¶ 57–60; Sur-reply 7–8.

Thus, Cousins is similar to Doi, in that Doi also teaches an image input unit which can do some limited processing of sensor data to obtain an image and then sending the data to a separate computer that performs more advanced processing. *See* Ex. 1005, 7:10–8:12, Figs. 1–3. Thus, neither reference teaches a

> Handheld computer apparatus comprising: a housing; . . . [and] computer means within said housing for analyzing said image to determine information concerning a position or movement of said object handheld device

as required by claim 1, because the computer means is not within a housing of the handheld computer apparatus but is a separate device.

We determine that Petitioner's analysis is insufficient to establish that one of skill in the art would understand that Cousins' "expert systems" are within the housing of the handheld imaging device.[10] Therefore, Petitioner fails to establish that the combination of Doi and Cousins teaches all of the limitations of claim 7.

### 4.    *Claims 8–12*

Claims 8–12 depend from claim 7. As Petitioner fails to establish that the combination of Doi and Cousins teaches all of the limitations of claim 7, it likewise fails to establish the same for claims 8–12 based at least on their dependency from claim 7.

---

[10] The Petition does not rely on Cousins' imaging device alone without the expert system as that is the only embodiment in Cousins related to reading hand gestures. *See* Pet. 19–21 (the only citations to Cousins in the reasons to combine are to Ex. 1006, 13:33–47); *see also* Reply 9–10 (arguing over Cousins' imaging device divorced from the expert systems).

IPR2021-00917
Patent 7,933,431 B2

> I.   *35 U.S.C. § 103(a) – Doi, Cousins, Parulski*

Petitioner asserts that claim 13 of the '431 patent would have been obvious over Doi, Cousins, and Parulski. Pet. 33–34. Claim 13 depends from claim 7. Petitioner does not rely on Parulski in a manner that would overcome the deficiencies identified above with respect to independent claim 7. Thus, Petitioner has not shown how the combination of Doi, Cousins, and Parulski teaches all of the limitations of claim 13 for at least the same reasons as independent claim 7.

> J.   *Jurisdiction Over Expired Patents*

Patent Owner argues that the USPTO does not have jurisdiction over expired patents. PO Resp. 1–2. Rather, Patent Owner argues, the USPTO only has jurisdiction over patents with claims that can be amended or cancelled. *Id.* Patent Owner states that, as explained by the Supreme Court, "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts," including for the USPTO to "reexamine—and perhaps cancel—a patent claim in an inter partes review." *Id.* (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1368, 1374 (2018). However, Patent Owner argues that this authority does not extend to expired patents because the public franchise associated with an issued patent no longer exists after expiration. *Id.* at 2. Thus, it is argued, the USPTO no longer has jurisdiction, even though the patent owner "may be entitled to collect damages" for patent infringement, because "the patent owner[] no longer has the right to exclude others" and the USPTO has nothing to cancel or amend. *Id.*

Patent Owner reasons that:

> Expiration removes the patent from the [US]PTO's jurisdiction
> and returns it to the sole jurisdiction of the Article III courts,

IPR2021-00917
Patent 7,933,431 B2

> which have exclusive authority to govern claims for damages. If
> this were not so, the [US]PTO would purport to have authority
> to retroactively modify a public franchise that no longer exists,
> in a setting where the expired public franchise does not enjoy any
> presumption of validity and in which amendment of claims is no
> longer permitted.

*Id.*

Inter partes review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs.*, 138 S. Ct. at 1374 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear that *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 Fed. Reg. 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board)[11] ("The claim construction standard adopted in this final rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that '[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning').").

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review merely refers to patents, with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline"

---

[11] Available at https://www.federalregister.gov/d/2018-22006/p-13.

IPR2021-00917
Patent 7,933,431 B2

makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute or legal precedent that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the Patent Office's authority to take a second look at an earlier administrative grant of a patent ends when the patent term expires even though the rights granted by the patent are not yet exhausted.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.

### K.    *Motion to Strike*

Petitioner also filed a Motion to Strike (Paper 19) and Patent Owner filed an Opposition to the Motion to Strike (Paper 23). The Motion to Strike requests that we strike Ex. 2008 for assertedly being new improper evidence. Paper 19, 1 (citing Consolidated Trial Practice Guide (Nov. 2019)[12] 73–74). The Motion to Strike also requests that we strike § V.A of Patent Owner's Sur-reply (Paper 18). Paper 19, 1.

As this Decision does not rely on or cite to Ex. 2008, we determine that these portions of the Motion to Strike are moot.

Concerning § V.A of Patent Owner's Sur-reply, we deny Petitioner's request to strike. As already discussed herein, Patent Owner's arguments in the Sur-reply related to support for claims 7, 9, and 11 in the '777 provisional (i.e. § V.A) were in direct response to Petitioner's related arguments in the Reply. We do not fault Patent Owner for relying on

---

[12] Available at www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2021-00917
Patent 7,933,431 B2

Petitioner's statement affirmatively "assum[ing]" priority to the '777 provisional. *See* PO Resp. 39 (quoting Pet. 12). Further, the disclosures of the '431 patent and the '777 provisional are very similar and Petitioner in its claim construction laid out and admitted support in the '431 patent for the main claim limitations of claims 7 and 11, with claim 9 closely related to claim 7. Pet. 13–17. Reviewing the '777 provisional, it can be seen that most, if not all, of the disclosures from the '431 patent relied on by Petitioner and Petitioner's declarant are present in the '777 provisional.

Under the facts of the present case, the issue of priority to the '777 provisional was not in issue until Petitioner raised it in the Reply. And thus, Patent Owner's response in the Sur-reply was proper. Petitioner had the opportunity and did challenge the claim to priority in the Reply. But by not addressing any specific claim limitation that was not supported, Petitioner waived the opportunity to make specific arguments in that regard.

For these reasons, Petitioner's Motion to Strike is rendered moot and otherwise denied.

## III.    CONCLUSION

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that some of the challenged claims are unpatentable, as summarized in the following table:

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 7–9, 11, 12 | 102(e) | Numazaki | 7–9, 12 | 11 |
| 7, 9, 11 | 103(a) | Rhoads | | 7, 9, 11 |
| 7–12 | 103(a) | Doi, Cousins | | 7–12 |
| 13 | 103(a) | Doi, Cousins, Parulski | | 13 |

IPR2021-00917
Patent 7,933,431 B2

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Overall Outcome | | | 7–9, 12 | 10, 11, 13 |

## IV.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 7–9, 12 of U.S. Patent 7,933,431 B2 have been shown to be unpatentable;

FURTHERED ORDERED that claims 11 and 13 of U.S. Patent 7,933,431 B2 have not been shown to be unpatentable;

FURTHERED ORDERED that the portions of Petitioner's Motion to Strike that are not moot are denied; and

FURTHERED ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00917
Patent 7,933,431 B2

FOR PETITIONER:

Raghav Bajaj
David McCombs
Angela Oliver
HAYNES AND BOONE, LLP
Raghav.bajaj.ipr@haynesboone.com
David.mccombs.ipr@haynesboone.com
Angela.oliver.ipr@haynesboone.com

Ashraf Fawzy
Alyssa Holtslander
UNIFIED PATENTS, LLC
afawzy@unifiedpatents.com
alyssa@unifiedpatents.com

FOR PATENT OWNER:

Todd Landis
John Wittensellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com

US007933431B2

(12) **United States Patent**
Pryor

(10) Patent No.: **US 7,933,431 B2**
(45) Date of Patent: **Apr. 26, 2011**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Tecumseh (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/834,281**

(22) Filed: **Jul. 12, 2010**

(65) **Prior Publication Data**

US 2010/0277412 A1      Nov. 4, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
*G06K 9/00*      (2006.01)

(52) **U.S. Cl.** ...................... 382/103; 382/104; 348/207.1
(58) **Field of Classification Search** .................. 382/103, 382/104; 348/207.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,878,174 A * | 3/1999 | Stewart et al. ................. | 382/293 |
| 6,342,917 B1 * | 1/2002 | Amenta ...................... | 348/207.1 |
| 6,453,180 B1 * | 9/2002 | Endoh et al. .................. | 455/567 |
| 6,597,817 B1 * | 7/2003 | Silverbrook .................. | 382/289 |

* cited by examiner

*Primary Examiner* — Tom Y Lu

(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57) **ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

31 Claims, 22 Drawing Sheets





      Unified Patents Exhibit 1001

Case: 23-1444    Document: 12    Page: 91    Filed: 07/10/2023



## FIG. 1A



## FIG. 1B

## FIG. 1C



**FIG. 2A**

**FIG. 2B**



**FIG. 2C**



**FIG. 2D**



**FIG. 4A**



**FIG. 3A**



**FIG. 4B**



**FIG. 3B**



**FIG. 3C**



# FIG. 5A



# FIG. 5B



**FIG. 6**



**FIG. 7**



**FIG. 9**



**FIG. 8A**

**FIG. 8B**



**FIG. 10A**

APPX58



*FIG. 10B*



**FIG. 11A**



*FIG. 11B*

U.S. Patent

Apr. 26, 2011

Sheet 15 of 22

US 7,933,431 B2

APPX62



**FIG. 12**

U.S. Patent

Apr. 26, 2011

Sheet 16 of 22

US 7,933,431 B2

APPX63



**FIG. 13**

U.S. Patent

Apr. 26, 2011

Sheet 17 of 22

US 7,933,431 B2

APPX64



**FIG. 14A**

Case: 23-1444    Document: 12    Page: 108    Filed: 07/10/2023



## FIG. 14B



## FIG. 14C



*FIG. 15*

U.S. Patent

Apr. 26, 2011

Sheet 20 of 22

US 7,933,431 B2

APPX67



**FIG. 16**

U.S. Patent

Apr. 26, 2011

Sheet 21 of 22

US 7,933,431 B2

APPX68



1710

y
x
z

1725

COMP.

1745

1750

1704

1702

1701

1715

1700

1740

1730

1735

1736

1720

**FIG. 17A**

1755

1700

**FIG. 17C**

U.S. Patent

Apr. 26, 2011

Sheet 22 of 22

US 7,933,431 B2

APPX69



**FIG. 17B**

US 7,933,431 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING, OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/980,710 filed Oct. 31, 2007, now U.S. Pat. No. 7,756,297; which is a continuation of application Ser. No. 10/893,534 filed Jul. 19, 2004, now U.S. Pat. No. 7,401,783; which is a continuation of application Ser. No. 09/612,225 filed Jul. 7, 2000, now U.S. Pat. No. 6,766,036; which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter:

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098, 891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;
2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;
3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub. Appln. 2002-0036617, now abandoned;
4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;
5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015, 950;
6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;
7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and
8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;
2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;
3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297;
4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;
5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187,397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227, 985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

3

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

### THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1A** illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1B** for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids

4

or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180**-**183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. **1C**, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. 4,219,847 and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2A**, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2A**, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1C** may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000×1000 pixels, or more (today the largest IVP makes is 512×512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

**5**

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100×100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180**-**183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000×1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10×10 pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only $\frac{1}{100}$ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000×2000 cameras coming on stream, it may only be necessary to look at every 15th or 20th pixel in each direction to get an adequate feel for target location. This means every 200th to 400th pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

**6**

FIG. **2C**

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. **2**C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. **2D**—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels $c1 \ c2 \ c3 \ldots cn$ representing a circle **282** at the outer perimeter of the array, **285**, of 1000×1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of $\frac{1}{100}$ field in width, this means that a target image entering the field such as circular target image **289** (which is shown intersecting element cm and its neighbors) would have to travel $\frac{1}{100}$ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches×300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. **3**

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of

US 7,933,431 B2

7

features as is well known. It is also useful to add pixel intensities of successive images in computer 220 for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest in it, for example by moving the object up and down with ones hand.

For example consider FIG. 3A, where a human 301 moves his finger 302 in a rapid up and down motion, creating different image positions sequentially in time of bright target ring 320, 320' on his finger, as seen by camera 325. If the camera can read quickly enough each of these positions such as 326 and 327 in image field 328 can be resolved, other wise a blur image such as 330 is registered on the camera and recorded in the computer 335.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. 3B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such 340 on object 341 shown. Successive frames taken with camera 345 looking at pixel window 346 at 300 scans of the pixels within the window per second where the image 347 of the LED target is located, can determine, using computer 349 (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target 340, if blinked at a 60 hz rate. Both blink frequency, blink spacing, blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target 340 is a retro-reflector as in FIG. 1, with an illumination source such as 355 near the

8

axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. 3C where a target 380 (on object 360) illuminated by a light source 365 provides a time variant intensity change in the camera image 368 obtained by camera 370 as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor 369 described in a copending application is used in addition to, or instead of a matrix array in camera 370, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace 375 corresponding to the movement of diamond target 380 a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. 4A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation from object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. 1. For example red led 401 illuminates retro reflector target 405 on object 406 during frame 1 (or partial frame, if not all pixels addressed) taken by camera 410. Then yellow led 402 illuminates target 405 on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

US 7,933,431 B2

9 10

For example, consider FIG. 4B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510**-**512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. **2** above, and shown in FIG. **5**b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540**-**543**, are used to rapidly find a target with low resolution, such as dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000×1000 pixels there could be one or more target images occupying 10×10 pixels or more. Thus in any group of 10×10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also

falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filed in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. **1** and **6**. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to

US 7,933,431 B2

**11**

determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.
1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;
2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and
3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. **7**, object **700** has co-target **701** at one end, visible to camera **705**. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, **720-723**, point in the general direction of the four corners **730-733** of the rectangular object **700**.

FIG. **8**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. **8**A illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

**12**

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone **800** held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector **801** as in FIG. **14**, in this case detected by detector **802** on the dashboard **803**. Alternatively and or in conjunction, one may use features such as round dot targets **805-807** on the cell phone which are sensed, for example, by a TV camera **815** located in the car headliner **816** or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. **1** to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit **824** in the car to print data coming through on the phone, the user just points (as illustrated in position **2**) the cell phone toward the fax, and the TV camera **815** scans the images of targets **805-807** on the face toward the camera, and the computer **830** connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. **8**B, where an image of object **849** acquired

US 7,933,431 B2

13      14

by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. **8A**, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer projected spot **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number 5, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. **9**

FIG. **9** illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in the copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10**A. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in this position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recog-

15

nition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that headrest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window 1066 dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deceleration was detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

16

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital or step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or wherever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an

**17**

important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically based (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as **1101** and **1102** are observed by camera of the invention **1110** placed directly overhead of the play board **1115**, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners **1130**, **1131**, **1132**, and **1133** can also be observed to establish a reference coordinate system for the computer **1140** to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top **1141** on marker **1101**). For example a train shape **1102** of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points **1130**-**1133** and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor **1150**, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound from speaker **1155** connected to computer **1140**) can also be programmed to show an image or sound that corresponds to

**18**

the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as **1160** stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. 11B, the TV camera senses the image of train marker **1101**, and conveys this information to computer **1140**, which causes the display **1150** and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder **1151** used as an input of display imagery (e.g., from local celebrity **1158**) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen **1150**.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem **1152**, send the board game computer **1140** to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead. A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table **1165**. The board is displayed (from software images or cad models of the board in computer **1166**) on a high resolution table top HDTV LCD screen **1167** with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using physical tokens such as **1101** and **1102**. In this case the

US 7,933,431 B2

**19**

display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using normal objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autostereoscopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201**a, and **1202** moves to **1202**a indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

**20**

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. **13** Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

US 7,933,431 B2

21                                    22

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14**C, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video

US 7,933,431 B2

23

24

displayed image of a real skyscraper progressing as he builds his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. **16**

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512×512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10×10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of **2**b wherein every 20th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000×1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. **17**

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17**A, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of trans-ducer location (in this case performed optically by camera **1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17**C, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch

APPX81

US 7,933,431 B2

25

manner to all points needed for spatial resolution of this order. This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. 17B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. 17A.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

What is claimed is:

**1**. A method for controlling a handheld computing device comprising the steps of:

holding said device in one hand;

moving at least one finger in space in order to signal a command to said device;

electro-optically sensing light reflected from said at least one finger using a sensing means associated with said device;

determining from said sensed light the movement of said finger, and

using said sensed finger movement information, controlling said device in accordance with said command.

**2**. A method according to claim **1**, wherein at least one camera is utilized to effect said electro-optical sensing.

**3**. A method according to claim **1**, including the further step of acquiring an image of at least a portion of the user of the device.

**4**. A method according to claim **1**, wherein said movement is sensed in 3 dimensions.

**5**. A method according to claim **1**, wherein movement of one finger relative to another finger is sensed.

**6**. A method according to claim **1**, wherein movement of two fingers is sensed.

**7**. Handheld computer apparatus comprising:

a housing;

a camera means associated with said housing for obtaining an image using reflected light of at least one object positioned by a user operating said object;

26

computer means within said housing for analyzing said image to determine information concerning a position or movement of said object; and

means for controlling a function of said apparatus using said information.

**8**. Apparatus according to claim **7**, wherein said object is a finger.

**9**. Apparatus according to claim **7**, further including a display function which is controlled.

**10**. Apparatus according to claim **9**, wherein said display is 3D display.

**11**. Apparatus according to claim **7**, further including means for transmitting information.

**12**. Apparatus according to claim **7**, further including a light source for illuminating said object.

**13**. Apparatus according to claim **7**, wherein said apparatus is a cellular phone.

**14**. A method for controlling a handheld computing device comprising the steps of:

providing a computer within said device;

associating a camera with said device, said camera viewing at least a portion of the body of a user operating said device or an object held by said user, in order provide image data concerning said portion or object;

using said computer, analyzing said image data to determine information concerning a user input command; and

from said determined information, controlling a function of said device.

**15**. A method according to claim **14**, wherein reflected light from said body portion or object is imaged by said camera.

**16**. A method according to claim **14**, wherein said information includes the position of the portion or object.

**17**. A method according to claim **14**, wherein said information includes the change in position of the portion or object.

**18**. A method according to claim **14**, wherein said information includes the velocity or path of the portion or object.

**19**. A method according to claim **14**, wherein said information is obtained in 3 dimensions.

**20**. A method according to claim **14**, wherein said information includes the pointing direction of the portion or object.

**21**. A method according to claim **14**, wherein a display is controlled.

**22**. A method according to claim **21**, wherein a virtual image on said display is moved or changed.

**23**. A method according to claim **21**, wherein said display is a 3D display.

**24**. A method according to claim **23**, wherein said display is a stereoscopic display.

**25**. A method according to claim **14**, including the further step of transmitting data to a further device.

**26**. A method according to claim **14**, wherein said camera operates at 30 frames per second or greater.

**27**. A method according to claim **14**, wherein said controlled function relates to a game.

**28**. A method according to claim **14**, including the further step of acquiring a picture of the user of the handheld device.

**29**. A method according to claim **14**, wherein two fingers of the user are sensed and a pinching action determined.

**30**. A method according to claim **14**, wherein said body portion indicates an expression of said user.

**31**. A method according to claim **14**, wherein said information provides an aid to speech recognition.

\*    \*    \*    \*    \*